# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| SANDPIPER CONDOMINIUM COUNCIL OF OWNERS, INC. | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 2:18-CV-00414 |
| LEXINGTON INSURANCE COMPANY | § § | |
| Defendant | § | |

## PLAINTIFF'S RESPONSE TO LEXINGTON'S MOTION TO COMPEL

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff SANDPIPER CONDOMINIUM COUNCIL OF OWNERS, INC. ("Sandpiper" or "Plaintiff"), and files this Response to the Motion to Compel filed by Defendant Lexington and would show as follows:

### BACKGROUND

1. Plaintiff has previously filed or served objections, claims of privilege, and motions for protection with respect to Lexington's discovery. Plaintiff relies on the evidence and declarations filed with the court previously in such regard. Prior declarations of William Chriss, Al Ramacciotti, and Terry A. Thomas were denominated as Exhibits A, B, and C, respectively, to Sandpiper's Reply to Lexington's Opposition to Sandpiper's Motion to Quash. Additional evidence filed herewith or to be filed in connection with this discovery dispute are denominated Exhibit D, Exhibit E, and Exhibit F, as well as attachments thereto marked D-1, D-2, etc.

2. Almost two years ago in August of 2017, Plaintiff Sandpiper's property sustained millions of dollars of property damage as a result of Hurricane Harvey. Sandpiper's first layer of coverage on the building was with TWIA in the amount of $4.3115 million, which amount was also the deductible on Lexington's policy, which covered the building up to over $27 million. Less than thirty days after the storm, TWIA acknowledged its $4.3115 million limits would be exceeded by the covered damage. Similarly, Lexington's claim file shows it knew immediately (September 11, 2017) that Sandpiper was:

> a 9 story building built back in 1984 with 104 units. Based on what we can see, each one of these units have sustained some type of water damage coming from following: Roof top (ripped off); Water leaking down from the roof into the interior; Blown-out windows; Blown-out doors; Wind-driven rain; Heavy mold;…There is a large section of structural damage to the side of the building where bricks were blown-off exposing the interior of the building.[1] Exhibit D-1 to Chriss Declaration, (Document Lexington_000002).

3. From then until March of 2018 and even thereafter (a period of over six months), Sandpiper allowed Lexington and its building consultants/engineers to control the repairs to the building and to dictate to Sandpiper's contractors what should and should not be done to the building and what Lexington would and would not pay for. In some cases, Lexington overruled repair advice from its own consultants and instructed Sandpiper's repair contractor accordingly. Lexington and its consultants discussed the repair process and the damage to the building with Sandpiper and its general contractor Taylor Mades Construction, and/or Sandpiper's engineering consultants, including Hanson Engineering, on a weekly if not daily basis. This process went on for over six months with Sandpiper and its contractors allowing Lexington full and unfettered access to the building and

---

[1] The building is actually 12 stories tall.

relying upon Lexington's instructions with respect to how to repair the damage. Exhibit E, English Allbritton Declaration.

4. Lexington's adjuster inspected the windows and doors in the building and the curbs in which some of the windows and doors were mounted. Shortly prior to Sandpiper hiring counsel, Lexington's adjuster advised Sandpiper that Lexington would not pay for some of the damage. As one example, replacing windows and sliding glass doors that Lexington admitted were damaged by Harvey would require replacing the frames or curbs in which they were set, but Lexington's adjuster refused to pay some portion of that cost because he observed that some curbs had signs of previous wear or damage. As another example, although all of the unit entry doors were racked and damaged by wind, Lexington would only acknowledge coverage for 54 of the 104 unit entry doors. Exhibit E, English Allbritton Declaration.

5. Nonetheless, after the end of this process, even Lexington was still forced to conclude that:

> Harvey's winds had torn off a section of the roof and blown out several windows, causing interior water damage to more than 90% of the building interior. Several residential and commercial HVAC units appeared to be damaged. Damage was also noted to the building's elevators, doors, and windows. The period in which the building was without power had allowed mold growth to the interior of several units. Exhibit D-3 attached to Chriss Declaration (July 24, 2018 letter from Lexington, p. 2).

6. When it became clear that Lexington would not pay the full cost of removing and replacing the windows, sliding glass doors, unit entry doors, and several other aspects of the hurricane damage to the building, Sandpiper decided to hire an attorney and pursue litigation. The decision to proceed in this manner was initially made at a March 8, 2018 board meeting. It was determined that litigation would be necessary, the idea of hiring a public adjuster was not pursued, and

undersigned counsel was interviewed on April 4, 2018. Exhibit E Albritton Declaration.

7. From March 8, 2018 until June 27, 2018, 2018, Sandpiper continued to provide Lexington with any information or access to the property Lexington requested. On or about March 30, 2018, Lexington finally showed Sandpiper its evaluation, adjustment, and estimate of the claim. That adjustment was presented in spreadsheet format and was sent to Sandpiper with a Proof of Loss document. Lexington claimed that Sandpiper's claim for building damage was a total of only $7,464,603.92, of which 1,114,385.80 was alleged to be "depreciation." Sandpiper strongly disagreed with Lexington's adjustment of the building damage. However, Lexington and Sandpiper agreed that Lexington owed the separate policy limits of $2.030 million for business income loss (the complex was eventually out of the condo rental business for over a year and is still not fully operational).

8. According to Lexington, this would leave a net claim of only $2,318,718.12 to be paid after deducting Lexington's 4.3115 million deductible (that was partially insured through TWIA), the $1,114,385.80 Lexington claimed in depreciation, and advances made by Lexington of $750,000 on the income loss and $1 million advanced on the building loss to fund initial repairs. Thus, Lexington proposed that the amount still owed on its building loss was only $1,038,718.12 and that Sandpiper's net remaining income loss claim was $1,280,000, for a total of $2,318,718.12 still owed. Exhibit D-4 attached to Chriss Declaration (email and attached documents from Lexington adjuster dated March 29, 2018).

9. These documents also show that when it proposed this, Lexington knew that Sandpiper was already, at that point, claiming that the building loss was not $7,464,603.92, but rather, over $10 million, including the $1 million policy sub-limit for increased repair costs incurred due to the need to meet current upgraded

codes (as to which Lexington estimated "0"), and that Sandpiper had submitted invoices and costs supporting its claim. Exhibit D-4 attached to Chriss Declaration (email and attached documents from Lexington adjuster dated March 29, 2018).

10. At no time during this process and prior to compiling and proposing its adjustment on the claim did Lexington request that Sandpiper produce internal communications, board meeting minutes, communications with contractors or consultants, emails, maintenance records, etc., i.e., any of the types of documents of which Lexington now appears to seeks to compel production. Exhibit E Albritton Declaration.

11. Still frustrated by Lexington's behavior, on April 10. 2018, Sandpiper requested a written contract from undersigned counsel to sign. By April 19, 2018, a contract was entered into employing undersigned attorneys to proceed with litigation on a contingent fee basis. Exhibit D Chriss declaration and D-5 attached to Chriss Declaration (contingent fee agreement).

12. Between April 13, 2018 and June 27, 2018, Sandpiper and its counsel and expert litigation consultants investigated the building and compiled information in order to provide Lexington with a more complete proof of loss and written demand setting forth Sandpiper's best information and belief with respect to the Hurricane Harvey loss that Lexington had undervalued. Meanwhile, in May 2018 Lexington paid Sandpiper the remaining $1,280,000 in business income limits and the $1,038,718.12 it had miscalculated as the remaining net actual cash value of the building damage.

13. On June 27, 2018, less than ninety days after Lexington's first proposed proof of loss on the entire claim, Plaintiff provided Lexington with a preliminary proof of loss showing that the building loss then claimed was a total of $12 million, producing a net building claim of $3,849,781.88, after deduction of prior

payments, deductible, and calculated depreciation. Exhibit D-2 attached to Chriss Declaration (June 27, 2018 Proof of Loss; See also Plaintiff's pre-suit notice attached as Exhibit A to Plaintiff's First Amended Petition in State Court). As repairs have proceeded and additional bids have been obtained for work yet to be done, that figure has increased to approximately $15 million, producing a net building claim of approximately $8.65 million, including the $2,114,385.80 Lexington knows that it owes in depreciation and code upgrades but has not yet paid.

14. Lexington's responded to Sandpiper's claim and proof of loss by rejecting them and adhering to its own prior adjustment of the claim, except that Lexington now finally acknowledged that there was an additional $1 million in coverage under its policy for code upgrades and that Lexington *expected to pay this $1 million as well as the $1,114,385.80 in withheld depreciation* "once proof of repairs is provided." Lexington's only offer to settle the claim was to propose that it would pay these same amounts "in full and final settlement of the claim." Unable to settle its multi-million dollar claim in exchange solely for amounts Lexington had admitted it would eventually have to pay anyway, Sandpiper filed suit on September 5, 2018. Exhibit D-3 attached to Chriss Declaration (July 24, 2018 letter from Lexington, pp. 5-7).

15. Although it represented that it would pay the $1 million in code upgrades and the withheld depreciation once "proof of repairs is provided," and although such proof was provided and Lexington inspected the building on May 28, 2019 to verify the repairs made, Lexington still refuses to pay these amounts, even though proof of the repairs was provided approximately 60 days ago. Exhibit D-6 and D-11 attached to Chriss Declaration (letters and emails exchanged with counsel on moneys acknowledged but still withheld; Lexington's Amended Interrogatory Answers, #10, and #11).

## THE DISCOVERY DISPUTE

16.  Meanwhile, after suit was filed Lexington chose the Friday before the Christmas (December 20, 2018) to serve 65 Requests for Documents on Plaintiff under Rule 34, including a demand that Plaintiff provide "privilege logs" of any and all documents withheld "in Excel spreadsheet format, containing the following fields (columns): the Bates number; date; from, to, cc, bcc, document type, description and basis for withholding/redacting." As recently as April of 2019, Lexington continued to press Sandpiper for privilege logs and did not indicate until recently that it would claim that privilege logs were not required for documents generated after the lawsuit was filed. Lexington continued to make repeated requests for privilege logs without temporal qualification, while refusing to produce privilege logs itself. Exhibits D-7 and D-8 attached to Chriss Declaration (Lexington's Requests for Documents and correspondence regarding privilege logs).

17. Sandpiper timely filed objections, responses, and claims of privilege, specifically stating that it was withholding attorney-client privileged materials, and material generated by or for or between or among Sandpiper, its representatives, agents, and consultants after litigation was anticipated in this case. Sandpiper also objected to Lexington attempting to dictate the nature of any privilege logs or statements of privilege, saying:

> Plaintiff objects to the request for privilege logs to the extent it seeks to require information beyond that required by the rules, including the demand for Bates stamping, the creation of excel spreadsheets, and other activities. Plaintiff is not required to go beyond the requirements of Rule 26(b)(5) and objects to the requested format of any such privilege log and to creating one as beyond the scope of the rules and unduly burdensome and costly.   Exhibit D-9 attached to Chriss Declaration (Plaintiff's Responses to Lexington Document Requests, p. 3, paragraph 4).

Among Sandpiper's assertions of privilege in response to such requests,

Sandpiper claimed that:

> Plaintiff withholds information that is privileged or subject to protection as work product or trial preparation material describing the nature of the documents, communications, or electronically stored information as follows: All documents and information containing or reflecting communications among attorneys representing Sandpiper, all documents and information containing or reflecting communications between attorneys representing Sandpiper and Sandpiper or its consultants, representatives, or agents, including its member unit owners, its managing agents such as CCMS and their respective employees, all documents constituting or reflecting communications between CCMS, Sandpiper and Sandpiper's attorneys, all documents containing or reflecting communications between Sandpiper and any of its agents, representatives, or consultants after Sandpiper anticipated litigation in this case, which was before March 21, 2018, if not well before, including its member unit owners, contractors, Borden Insurance, Hanson Engineering, Mike Krismer, Krismer Consulting, Art Boutin; Jaco, CCMS, and TMC, all draft reports or documents created by such consultants after such date, and all documents and tangible things prepared after anticipation of litigation by or for Sandpiper or its lawyers and agents. Exhibit D-9 attached to Chriss Declaration (Plaintiff's Responses to Lexington Document Requests).

18. Essentially, Sandpiper asserted privilege (attorney-client and Texas "work product")  and protection from discovery under the federal work product protection provided under Rules 26(b)(3) and 26(b)(4), and  Sandpiper subsequently identified, by reference to its board meetings, the specific date of March 8, 2018 as the date it anticipated litigation.

19. Sandpiper also objected to many of the 65 document requests as overbroad and failing to apprise Plaintiff of a specific category of documents being sought, such that compliance would be unduly and unreasonably costly and burdensome. Requests were further objected to because they sought information not relevant and proportional to the needs of the case. Examples of such requests included "all documents concerning any communications with any person…concerning: (i) the Policy; (ii) insurance coverage and/or the absence of insurance coverage for

Harvey-related Damage; (iii) the Property; and/or (iv) the Harvey-related damage; and/or (v) the Claim…" Exhibit D-7, Requests 14, 15.

20. Sandpiper objected on the same bases to a number of requests where Lexington, without previously requesting them or needing them to inspect and evaluate the insurance claim, asked for "all documents concerning" prior maintenance and repairs to various parts of the building for the last 15 years. Exhibit D-7, Requests 22, 23, 24, 26.

21. Sandpiper objected on the same bases to a number of overbroad and objectionable requests asking for obviously privileged materials and/or that did not specify a category of documents to produce (e.g., produce "all documents concerning any damages claimed"). Such requests constituted nothing more than impermissible fishing expeditions. *See*, e.g., Exhibit D-7, Requests 21, 29.  It is clear under the federal rules that such requests are improper. *Nexxus Prods. V. CVS N.Y., Inc*., 188 F.R.D. 11, 20 (D. Mass. 1999). A Rule 34 document request is improperly overbroad and not reasonably particular if it merely requests "documents related to a claim or defense." *Kidwiler v. Progressive Paloverde Ins*., 192 F.R.D. 408, 412 (M.D.N.C. 1992). And a request that asks for all papers relied on in answering interrogatories is a *per se* example of a request that is overbroad and improperly fails to specify a category of documents with reasonable particularity. *Holland v. Muscatibe Gen. Hospital*, 971 F. Supp. 385, 392 (S.D. Iowa 1997). Yet, these are precisely the type of overbroad requests Lexington served on Sandpiper.

22. Subject to its objections and assertions of privilege, Sandpiper nonetheless produced to Lexington thousands of documents, including *thirteen years* of maintenance records from 2006 onwards; *twenty-four years* of Board meeting minutes from 1994 to 2018; drawings, emails, and other documents before and after Hurricane Harvey from its engineering consultants at Hanson Engineering;

email communications with, and bids and invoices from, its repair contractors; accounting and income and expense records; and internal compilations of bids, invoices and total damages. The number of emails or email strings produced alone is *in excess of 33,000,* including emails between Sandpiper and its repair contractors subsequent to March 8, 2018. Exhibit G Terry Thomas Declaration; Exhibit D-13 attached to Chriss Declaration, Letter of July 2, 2019 to counsel.

23. After receiving most of this information and after being fully advised of Sandpiper's position with respect to anticipation of litigation, work product, overbreadth, lack of proportionality, and attorney-client privilege, Lexington served record production subpoenas requesting essentially the same broad categories of information from three officers or representatives (hereafter "respondents") of Plaintiff, a non-profit corporation and association. These subpoenas are already before the court in connection with Plaintiff's Motions to Quash or for Protection. The subpoenas sought to invoke the court's contempt power to compel production of the essentially the same overly broad categories of documents from such persons, including obviously *per se* privileged and protected documents. Plaintiff and respondents timely served objections and claims of privilege in response to such subpoenas under Rule 45(d)(2)(B). Such objections were attached as Exhibit B to the general Motion to Quash and for Protection filed in this court. Plaintiff also filed motions for protection in each of the districts where the subpoenas sought to compel compliance. Plaintiff expressly does not waive any objection, motion, or privilege or protection from disclosure, and this reply is expressly subject to same.

24. Plaintiff and the persons upon whom the subpoenas were served (respondents) have asserted, by way of objection, claim of privilege and protection, and motion to quash and for protective order, privilege, protection from discovery, lack of proportionality, overbreadth, and undue burden and expense.

25. Plaintiff also, in its Motion for Protection in this court (E.D. #44), requested that the Court enforce the requirement of proportionality with respect to Lexington's discovery activities, including ordering that privilege logs not be required subsequent to each party's respective anticipation of litigation in this case.

26. Defendant has also separately issued record production subpoenas to about a dozen contractors and consultants (if not more) who did work at Sandpiper before or after the hurricane. With the exception of Hanson, Plaintiff's engineering consultant, and Borden Insurance, Plaintiff's insurance procurer, Plaintiff has neither objected nor asserted privilege in response to any of such subpoenas. Plaintiff's counsel consulted with both concerning this litigation, such that, at least for that purpose, they constitute representatives or agents of the client for privilege purposes. Exhibit D-11, Declaration of William J. Chriss.

27. However, at least two such witnesses did feel compelled to file their own objections.  Borden and South Texas Construction both filed motions for protection from the court. South Texas Construction's records custodian estimated that, due to the breadth of Lexington's document requests, it would take over 125 hours to gather in the neighborhood of 50,000 pages of documents and comply with it. *See* Motion to Quash filed by South Texas Construction in this court, ED #38 and #38-1) Similarly, Sandpiper estimates that it would take an entire work month (at least 180 hours) just to comply with Lexington's demands concerning emails generated after March 8, 2018 alone. *See* Exhibit B Declaration of Terry A. Thomas attached to Sandpiper's Reply to Lexington's Opposition to Motion to Quash. Based on South Texas Construction's affidavit, Sandpiper's time estimate is likely conservative.

28. Plaintiff has consistently alleged that it reasonably anticipated litigation in this case on or before March 8, 2018 and offered the Court *in camera* at the pre-motion conference a copy of its board minutes of that date so demonstrating.

Lexington has now filed the same board minutes in support of its Motion to Compel. Plaintiff's counsel's work began in this case on April 13, 2018, and the contract formally employing his firm to pursue this litigation on a contingent fee basis and bears a date of execution by all parties (including countersignature by employed counsel) of April 19th, 2018. Exhibits D and D-5.

## ARGUMENT AND AUTHORITIES

**29.** Lexington's Motion to Compel appears to seek no particular document or category of documents, but to ask the court to order blanket production of any documents withheld from discovery by Sandpiper and generated on or after March 8, 2018. As such, the motion is overbroad, improper, insufficient, and should be denied. Motions to compel must show that the responding party has failed to produce documents in response to a proper request. F.R.C.P. 37(a)(3)(B)(4); *GFI Computer Indus. v. Fry*, 476 F.2d 1 (5th Cir. 1973; *Nexxus Prods. V. CVS N.Y., Inc*., 188 F.R.D. 11, 20 (D. Mass. 1999).

**30.** Lexington does not state on what date it contends Sandpiper anticipated litigation, and does not argue that Sandpiper has waived attorney client privilege, or any other protection or privilege from discovery except as to board meeting minutes inadvertently produced between March and November of 2018. As such, in the face of the evidence adduced in support of Sandpiper's claims of privilege, protection, burden, and lack of proportionality, Lexington has not demonstrated any right to the relief sought.

31. Under the federal rules, all discovery must be proportional to the needs of the case and all parties have an obligation to ensure that it is and that it is not abusive or overly burdensome. F.R.C.P. 26(b)(1). *In re Bard IVC Filters Prods. Liab. Litigation*, 317 F.R.D. 562 (D.C. Ariz. 2016); Committee Notes to F.R.C.P. 26, paragraphs 9 and 10. *See* also *Dondi Properties v. Commerce Savings & Loan*, 121 F.R.D. 284 (N.D. Tex. 1988) (en banc). Plaintiff has already demonstrated the

burdensome, overly broad, and oppressive nature of Lexington's document request, and as for the overbroad document subpoenas to respondents, Rule 45(d)(3)(A)(iii) *requires* that a court "**must** quash or modify a subpoena that…requires disclosure of privileged or protected matter, if no exception or waiver applies..." Moreover, under Rule 45(d)(3)(A)(i)-(iii) a court must protect one subjected to a subpoena from undue burden or from failing to allow a reasonable time to comply, and Rule 45(d)(1) requires that the court "**must enforce**" *the serving party's* duty to "take reasonable steps to avoid imposing undue burden or expense" on a person subject to a subpoena. This requirement subsumes within it, as do all the discovery rules, the doctrine of proportionality. Indeed, once a proper and timely objection is made under Rule 45, a document subpoena does not require further response until the serving party moves the Court to compel compliance and the Court so orders. F.R.C.P. 45(d)(2)(B). Under the clear language of the rules, once the subpoenaed party has objected and the subpoenas are on their face overbroad and requesting privileged information, the court has an affirmative and mandatory duty to quash or modify them.

32. This is why Rule 45(d)(2)(B) (formerly Rule 45(c)(2)) provides protection from overbroad subpoenas that place upon a respondent the "burdensome task to provide full information regarding that person's claims to privilege or work product protection. Such a person is entitled to protection that may be secured" by such objections. F.R.C.P. 45- Advisory Committee Note 33. Parties adversely affected, such as Plaintiff, are entitled to the same protection, one vehicle for which is a motion to quash or modify or for protection. F.R.C.P. 45(d)(3).

33. With respect to all of Lexington's discovery requests and its Motion to Compel, in determining overbreadth and thus proportionality, the focus is on whether the request could have been more narrowly tailored to avoid including extraneous or privileged information. *In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex.

1998) (orig. proceeding); *In re CSX Corp.* 124 S.W. 3d 149, 153 (Tex. 2003) (orig. proceeding). Discovery that clearly requests privileged information is unduly burdensome *per se*. Undue burden is established and witnesses and litigants are entitled to relief when requests are overbroad on their face, or where only a fraction of the documents requested is likely discoverable or admissible. *Wiwa v. Royal Dutch Petroleum Co*., 392 F.3d 812 (5th Cir. 2004).

### Lack of Proportionality, Irrelevance, Overbreadth, and Burden

34. Lexington's Motion to Compel must be denied because of the objectionable and improper nature of its overly broad document requests *ab initio*. It must also be denied because it seeks to place unreasonable burden upon Plaintiff, because Plaintiff has established its assertions of privilege and protection, and because the discovery sought is not relevant and not proportional to the needs of the case.

35. In determining relevance, it is no longer sufficient for the requesting party to merely state that the documents "might lead to other relevant evidence." Rather, it must be shown that the evidence is not just a fishing expedition for impeachment information but that the evidence is actually relevant to proving a claim or defense. *Martin v. Bimbo Food Bakeries Distrib.*, 313 F.R.D. 1 (E.D.N.C. 2016). This Lexington has not done. All the **relevant** information has been produced or Lexington is subpoenaing it from other parties without objection. Plaintiff has withheld only internal documents and communications with and among its representatives, not bids, estimates, invoices, photographs, physical evidence, or correspondence with its primary repair contractors, which are the only documents relevant to the ultimate testimony by which the cost of covered repairs will be determined.

36. In determining proportionality, the court must primarily review the relative importance or lack thereof of the discovery in resolving the issues and whether the burden or expense of the discovery outweighs its likely benefit. F.R.C.P. 26(b)(1).

*In re Bard IVC Filters Prods. Liab. Litigation*, 317 F.R.D. 562 (D.C. Ariz. 2016);

Committee Notes to F.R.C.P. 26, paragraphs 9 and 10.


**The Documents Sought Are Not Critical to Lexington and Will Not Be**

**Important in Resolving the Dispute between the Parties**

37. As demonstrated, Lexington's response to Sandpiper's Sworn Proof of Loss and Written Notice of Claim was that "Lexington rejects this proof of loss at this time." (Exhibit D- attached to Exhibit D-3 Chriss Declaration, p. 6). There was no request for additional time to consider the claim and no request for emails, communications, or other documents before denying the claim. As the Texas Supreme Court has recently made clear, in Texas the insurer's "rejection or acceptance of a claim is the insurer's acknowledgement that it had all the information it needed form the claimant to determine whether the claimant was entitled to benefits under the policy." *Barbara Technologies v. State Farm Lloyds* and *Ortiz v. State Farm Lloyds* (Tex. June 28, 2019).

38. Within fifteen business days after receiving Sandpiper's written claim and proof of loss Lexington was required by Texas law to either: 1. Accept Sandpiper's claim; 2. Reject it; or 3. State that the reasons it needed additional time to decide. Even if it had opted for #3 Lexington was required to accept or reject the claim within 45 additional days. Tex. Ins. Code, Section 542.056. Lexington chose to reject the claim, rather than stating it needed 45 more days in order to decide. Now it would have this court compel the production of massive amounts of irrelevant or marginally relevant information that it did not even request for the months it was managing the repair process and that it did not request even after being presented a claim for a specific sum in writing. Either the information now sought by Lexington was not critical to the defense of its denial of this claim, or Lexington has now confessed that it acted in bad faith by denying the claim without having

first conducted a thorough investigation. Lexington is estopped by its denial and by Texas law from now claiming it needs additional information about "the Property" or "the Claim."

39. In addition, the documents Lexington has proffered under seal as examples of what it is looking for belie the relevance or proportionality of the information. The issue the information is supposed to be relevant to is the cost of repairs and the amount of damage, yet none of the board members or administrative personnel whose emails Lexington now seeks to strip have been shown to be experts qualified to opine on that subject at all. Is Lexington of the view that Mr. Ramacciotti, a board member, or Ms. Allbritton, the building manager at Sandpiper, are qualified to testify as to the reasonable and necessary cost of repairs to the building? If not, what is the justification for seeking such information that would outweigh the clear and proven burden of producing it. As indicated by the attached Exhibit G Declaration of Terry A. Thomas, the universe of documents is large, and the burden of culling through them undue. Just to cull thorough emails of two Sandpiper representatives generated on or after March 8, 2018 is likely to take over 10,000 minutes, which is to say around 180 hours (an entire work month, assuming eight hours a day and no other work that requires attention).

40. Sandpiper has already produced tens of thousands of emails and several hundred thousands of pages of documents. Exhibit G Terry Thomas Declaration. If what Lexington seeks is unprivileged communications between Sandpiper and its repair contractors, it is already obtaining same from those contractors without the necessity of imposing further discovery burdens on Sandpiper.

**The Burden or Expense of the Discovery Outweighs its Likely Benefit**

41. Sandpiper has demonstrated that:

   a. Lexington's discovery tactics are inconsistent with its own adjustment of the underlying claim, seeking information that it must concede is of

questionable relevance, since it was never requested for the first 16 months it investigated and adjusted Sandpiper's Hurricane Harvey claim.

b. The documents sought are not competent evidence of the main issues between the parties in this case, and thus there is little or no benefit to be gained by compelling Sandpiper to incur further burden and expense in responding to discovery that is clearly overbroad to begin with.

c. The burden of further responding to the discovery is immense, and includes not only a litigation burden, but also the ways in which Lexington's discovery has adversely affected Sandpiper's ability to make repairs to this day. Exhibit E Allbritton declaration and Exhibit F Ramacciotti Declaration; ED #38-1.

**Sandpiper's Assertions of Privilege and Protection Are Valid and Not Overly Broad**

42. In addition to the proof already filed in Reply to Lexington's Opposition to Sandpiper's Motion to Quash, the attached Declarations and the document requests themselves and Sandpiper's objections and assertions of privilege in response, prove that:

a. The subpoenas and document requests are overbroad and clearly request production of privileged information developed after this litigation was anticipated by Sandpiper;

b. Once litigation was anticipated, communications among or between Sandpiper and its representatives, including its attorneys, consultants, sureties, indemnitors, insurers, employees, or agents, are privileged and their business purpose cannot be neatly separated from the extent to which they were prepared in anticipation of litigation. *In re: Grand Jury Subpoena (Torf)*, 357 F.3d 900, 909-10 (9th Cir. 2004).

c. Thus, the documents created on or after March 8, 2018, are both protected from disclosure under the federal work product doctrine and the Texas work product privilege, with respect to which Plaintiff relies upon its previously filed Brief of Authorities.

d. For Plaintiff to assert its claims of privilege and protection, all that is required is to "describe *the nature* of the documents…not produced -- and do so in a manner that, *without revealing information itself privileged or protected*, will allow other parties to assess the claim." F.R.C.P. 26(b)(5) (emphasis added). Sandpiper has *not* made mere boilerplate objections or assertions of privilege. It has made separate objections and assertions of privilege in response to each request or subpoena, it has described with particularity the documents withheld, and it has produced privilege logs of over 200 pages in the format demanded by Lexington, even though Lexington refuses to do the same.

e. Although Lexington's Motion to Compel does not appear to address the issue, Sandpiper similarly identified and claimed attorney-client privilege as to communications between Sandpiper and its attorneys in this case and has demonstrated by affidavit that they were for the purpose of facilitating the representation. T.R.E. 503(b)(1). Exhibit E Allbritton declaration and Exhibit F Ramacciotti Declaration.

f. Defendant does not have a critical need for the information. Lexington has confessed as much when it failed to request the information for the ten months it was adjusting Sandpiper's insurance claim after Hurricane Harvey struck on August 25, 2017, and when it failed to request it before rejecting Plaintiff's proof of loss a year ago, on July 24, 2018.

g. It will be burdensome and oppressive to require Plaintiff to respond to the overbroad subpoenas and document requests by attempting to tease out

which of the thousands of emails and documents might be responsive and to evaluate their subject matter and verbiage, and to redact them or otherwise ensure that such documents do not reveal privileged information. Proportionality and Rule 26(b)(2)(C) specifically task courts with requiring parties to use discovery methods that are least burdensome and inconvenient to the assertion of privilege by the responding party. *Fidelity Mgmn't & Research Co. v. Actuate Corp.*, 275 F.R.D. 63, 64-65 (D.C. Mass. 2011).

    h. The discovery sought is therefore not proportional to the needs of the case as that term is understood under the federal discovery rules, and it is unnecessarily burdensome and unnecessarily invades privileges and protections from discovery to which Sandpiper is entitled by law.

43. In the alternative, because there is no further way to describe the content of the documents withheld without Lexington claiming that such description would either waive the privilege and without revealing the content of the privileged information, Sandpiper offers and hereby tenders to the court the withheld documents for *in camera* inspection.

**No Waiver**

44. As to the Board Meeting Minutes between March and November of 2018, Lexington acknowledges that undersigned counsel requested by letter that they should be "clawed back" under Rule 26(26(b)(5)(B) because they were specifically described as privileged before, or simultaneously with, being produced. Exhibit D-12. Again, Lexington acknowledges being promptly provided with redacted versions of the same minutes preserving the confidentiality of privileged or protected material. Claims of waiver with respect to privilege and protection from discovery are disfavored by the courts. *American Nat'l Bank & Trust Co. v. Equitable Life Assur. Society*, 406 F.3d 867, 855 (7th

Cir. 2005); *Transamerica Computer Co. v. Int'l Bus. Machines Corp.*, 573 f.2d 646, 651 (9th Cir. 1978). They require an intentional relinquishment of a known right. *Phillips v. Lagaly*, 214 F.2d 527 (10th Cir. 1954).

45. Moreover, Lexington's claim that Sandpiper has waived its discovery and evidentiary privileges by seeking to be paid what it is owed for hurricane damage is specious. In addition to photographs and physical evidence, Sandpiper will prove (and has already supported) its claim for specific amounts by bills, invoices, estimates, and opinions from experts as to the cause of the damage and the cost of repairs, not by internal communications among its members, attorneys, and representatives. This is *not* a situation where Plaintiff is seeking to use testimony or evidence it has shielded from discovery under a claim of privilege. *See,* e.g., *Nguyen v. Excel Corp.*, 197 f.3d 200, 20708 (5th Cir. 1999).

46. The fact that "as a matter of compromise" Lexington now appears to say that it doesn't seek attorney-client correspondence will not prevent Lexington from doing the same thing again. More importantly, Lexington has now only stated it is "willing to withdraw **the section of the subpoenas that specifically requests communications between the non-parties and Plaintiff's counsel**." Lexington's Opposition to Plaintiff's Motion to Quash, p. 10 (emphasis added). This is characteristic of Lexington's use of words and of the discovery process.

47. While Lexington now agrees to withdraw the "section" that "specifically requests" attorney-client privileged documents, the fact remains that the subpoenas are overbroad and still seek the same privileged information because they ask for "all documents concerning the Claim" and "all documents concerning Harvey related damage" and "all documents concerning the investigation and/or repair of Harvey related damage." Lexington's categories of document request are so broad that Lexington is *still requesting obviously privileged documents*. The subpoenas are grossly overbroad on their face, constituting nothing more than a fishing expedition

that includes counsel's confidential correspondence and work product and other materials protected from discovery under the federal work product doctrine and the Texas work product privilege. As such, the subpoenas should be quashed. Lexington should not be rewarded for continually bombarding Plaintiff and its agents with overbroad requests, so that the respondents will be required to undertake the "burdensome task to provide full information regarding that person's claims to privilege or work product protection. Such a person is entitled to protection that may be secured" from the court. F.R.C.P. 45- Advisory Committee Note 33. *See* also *Wiwa v. Royal Dutch Petroleum Co*., 392 F.3d 812 (5th Cir. 2004).

**Privilege Logs**

48. Lexington still has not explained to the court its choice of the date suit was filed as the time when the burden and expense of generating privilege logs should cease, except to simply assert that "the date on which Sandpiper started this suit is a reasonable and appropriate cut-off date for the parties' privilege logs." ) Lexington's Opposition to Plaintiff's Motion to Quash, p. 11). It is clear from the evidence adduced that litigation was anticipated by Sandpiper by March 8, 2018, or at least by the time Plaintiff's counsel was hired in April 2018, and Lexington was also aware of the likelihood of suit when it refused to pay Plaintiff's underlying insurance claim on July 24, 2018. Each of these dates is a more "reasonable and appropriate cut-off date for privilege logs," since the determination of this date should be based on when the parties' generation of documents in the ordinary course of business could be expected to be overtaken by anticipation of litigation.

49. Plaintiff continues to reserve all rights under prior assertions and claims of privilege in this case, and under briefs and memoranda of authorities and evidence submitted in support thereof. The Motion to Compel should be denied.

Respectfully submitted,

**THE SNAPKA LAW FIRM**
606 N. Carancahua, Suite 1511
P.O. Box 23017
Corpus Christi, Texas 78403
Telephone: (361) 888-7676
Facsimile: (361) 884-8545

*/s/ William J. Chriss*
**William J. Chriss**
State Bar No. 04222100
Email:  wjchrisspc@gmail.com
**Kathryn Snapka**
State Bar No. 18781200
Email: ksnapka@snapkalaw.com
**ATTORNEYS FOR PLAINTIFF**


## CERTIFICATE OF SERVICE

This is to certify that, on July 22, 2019, a true and correct copy of the foregoing was served on all counsel of record in accordance with the Federal Rules of Civil Procedure as follows:

Raymond L. Gregory II
EGGLESTON & BRISCOE, LLP
4800 Three Allen Center
333 Clay Street
Houston, Texas 77002
rlg2@egglestonbriscoe.com
&
Wayne R. Glaubinger
James M. Dennis
Diana McMonagle
One New York Plaza
New York, NY 10004
WGlaubinger@moundcotton.com
JDennis@moundcotton.com
DMcMonagle@moundcotton.com
**ATTORNEYS FOR DEFENDANT LEXINGTON INSURANCE COMPANY**

*/s/ William J. Chriss*
**William J. Chriss**
**Attorney-In-Charge for Plaintiff**