UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


SANDPIPER CONDOMINIUM COUNCIL )    CASE NO: 2:18-CV-00414
OF OWNERS, INC,                  )
                                )             CIVIL
            Plaintiff,     )
                                )     Corpus Christi, Texas
    vs.                        )
                                )   Wednesday, October 23, 2019
LEXINGTON INSURANCE COMPANY,   )
                                )    (3:16 p.m. to 4:33 p.m.)
            Defendant.    )


MOTIONS HEARING

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE



**APPEARANCES:**            SEE PAGE 2


Court Recorder [ECRO]:   Genay Rogan

Clerk:                 Brandy Cortez

Court Security Officer:   Brad Standlee

Transcribed by:        Exceptional Reporting Services, Inc.
                           P.O. Box 8365
                           Corpus Christi, TX 78468
                           361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES:**

For Plaintiff:           WILLIAM J. CHRISS, ESQ.
                         GREG TURMAN, ESQ.
                         KATHRYN SNAPKA, ESQ.
                         The Snapka Law Firm
                         606 N. Carancahua St., Suite 1511
                         Corpus Christi, TX 78401

For Defendant:           JAMES M. DENNIS, ESQ.
                         Mound Cotton, et al.
                         One New York Plaza
                         New York, NY 10004

1        **Corpus Christi, Texas; Wednesday, October 23, 2019; 3:16 p.m.**

2                              **(Call to Order)**

3              **THE COURT:**  So 2:18-CV-414, *Sandpiper Condominium*

4     *Council of Owners versus Lexington Insurance Company*.

5              The Plaintiff will announce.

6              **MR. CHRISS:**  William J. Chriss, Greg Turman and

7     Kathryn Snapka for Sandpiper.

8              **THE COURT:**  And then the Defense.

9              **MR. DENNIS:**  James M. Dennis, Mound Cotton Wollan &

10    Greengrass, for Lexington Insurance Company.

11             **THE COURT:**  Okay.  So there's some discovery matters

12    that have been pending for a little while and we set those and

13    then I think there's a couple other matters we could probably

14    address also.  So I have the pending that we can address first

15    and probably together.  It's the Plaintiff's motion for

16    protection from discovery and to modify or quash the subpoenas

17    issued to the individuals and then Sandpiper had filed -- wait,

18    I'm sorry -- and then Lexington had filed a motion to compel

19    production of the documents, the post-March 8th documents.

20             So some of those have related issues we can address

21    together and then we can work through each one after that.  How

22    do you-all want to do this?  I have reviewed this.  I have some

23    thoughts.  I can let you know what my thoughts are and then let

24    you-all argue more.  That way we can streamline where we are.

25    Or how do you want to proceed?

4

1          **MR. CHRISS:**  That would be fine with me, Judge,

2     whatever is the most efficient way to proceed and whatever is

3     going to be most helpful to the Court.

4          I should probably say as a preliminary matter, since

5     the Court asked whether or not the case has been resolved, that

6     we have demanded appraisal in the case which I think will

7     result in the Court abating the proceedings at some point once

8     we get an umpire appointed.

9          **THE COURT:**  Okay.

10          **MR. CHRISS:**  And so I just wanted to let the Court

11     know that.  I didn't want to misrepresent anything.

12          **THE COURT:**  Okay.  Do you want to say anything on

13     that, Mr. Dennis?

14          **MR. DENNIS:**  Yes, your Honor.  Not to get too far

15     ahead of ourselves, Lexington is going to oppose a motion to

16     abate and will also oppose appraisal.

17          **THE COURT:**  Okay.  Has the motion for appraisal --

18     that hasn't been filed?

19          **MR. CHRISS:**  No, Judge --

20          **THE COURT:**  Okay.

21          **MR. CHRISS:**  -- because I was waiting to hear if they

22     were going to oppose referring the matter to appraisal.  Now

23     that I know that, we will be filing a motion to compel

24     appraisal and abatement, yes.

25          **THE COURT:**  Okay.  So I'll wait on that.

1          **MR. DENNIS:**  Here it is -- this case has now been

2   pending for almost a year.  We have gone through a lot of

3   discovery, taken four depositions.  We have another one

4   scheduled for next week.  The Plaintiffs apparently feel that

5   it's time to abate the case to go and spend whatever months now

6   we're going to do on appraisal which, as I indicated, we would

7   oppose.

8          I have a suggestion, your Honor, in the alternate, is

9   instead of abating this case and spending months going off on

10  some appraisal, which won't dissolve the issues and is

11  inappropriate, that if this case is going to be abated for any

12  period of time that it be abated and we do it with mediation

13  which might be productive in lieu of an appraisal which, quite

14  frankly, is not going to get anybody anywhere in this case.

15          **THE COURT:**  Well, where are you-all in the discovery

16  to see if it's appropriate now to go on to mediation?  Your

17  thoughts on that?

18          **MR. DENNIS:**  We're actually coming up on the date in

19  the schedule when the Court indicated that Plaintiff could make

20  a demand which is November 15.

21          **THE COURT:**  But sometimes it depends on where you-all

22  are in discovery and how that's proceeded.  So --

23          **MR. DENNIS:**  Where we all are is, as I said, the

24  Plaintiff has produced a number of documents.  We have the

25  issues that are here today.  We've taken four depositions.  We

1   have a fifth teed up for November 6th and the remainder of the

2   depositions sort of depend on some of the rulings here today.

3   We had also proposed dates for the depositions of witnesses

4   that Plaintiffs had sought in the first two weeks of December.

5   So that's where we are on discovery.

6          **MR. CHRISS:**  Judge, just from Sandpiper's

7   perspective, we're coming up on a deadline next week to

8   designate our experts and as a result of preparing for that, I

9   have been educated by my experts to the extent that the extent

10  of the damage to the building and the extent to which we feel

11  Lexington has undervalued the claim is greater than we

12  previously thought.  And we're going to provide Lexington that

13  information in connection with our expert reports.  We're going

14  to abide by the Court's docket control order with respect to

15  making a demand.

16         We never have any objection going to going to

17  mediation before, during or after an appraisal award.  Of

18  course, after appraisal award, we might have some objections to

19  it but -- and we have not taken any depositions in this case.

20         **THE COURT:**  I just wonder.  You know, sometimes I

21  say, okay, you guys should go to mediation.  You say, well, we

22  need to do some more discovery.  We need more information.  So

23  that's kind of why I was trying to figure out --

24         **MR. CHRISS:**  Right.  I haven't taken one deposition

25  in this case, Judge.

1          **THE COURT:**  So not ready.  So the Plaintiffs --

2          **MR. CHRISS:**  No, I don't need to take a deposition to

3  go to mediation.

4          **THE COURT:**  Good.

5          **MR. CHRISS:**  I have the burden of proof with respect

6  to the amount of the damages and I know what they are.

7          **THE COURT:**  Okay.  But in terms of discovery, you

8  don't need to do depositions or get anything else from the

9  Defense to go to mediation?

10          **MR. CHRISS:**  Not to go to mediation.

11          **THE COURT:**  All right.  Because that's what I hear

12  Mr. Dennis saying, is let's go to mediation before we do, you

13  know, this appraisal and abatement and --

14          **MR. DENNIS:**  I think --

15          **THE COURT:**  -- the Defense is sometimes the one

16  arguing, no, we need more discovery.

17          **MR. DENNIS:**  I think that's appropriate, your Honor,

18  because I don't think that abatement --

19          **THE COURT:**  Like right now, you don't need to do

20  anything else?

21          **MR. DENNIS:**  In lieu of abating this case for no

22  other purpose than going to appraisal if there's going to be an

23  abatement or a stay of any type, we should use that for a

24  mediation.

25          **MR. CHRISS:**  And, Judge, there's no reason why we

8

1    can't do both at the same time.  There's nothing about the

2    appraisal process that prevents the parties from settling the

3    case.  That can -- or the insurance company from paying some

4    portion of the claim.  They can always do that while the

5    appraisal is pending but the contract provides that we're

6    allowed to have the amount of our loss determined in that

7    fashion.

8            I know the Court is very familiar with this.  This

9    Court and others -- myriad Courts have ordered that cases be

10   abated and that the matter go to appraisal.

11          **THE COURT:**  I just did that last week.  I don't know

12   what -- you know, what the argument is going to be here but I

13   guess I'm just asking.  Are you-all ready to go to mediation?

14   Then why don't you-all go to mediation?  I mean, we can work

15   through discovery issues today or whatever but if that's where

16   you-all are at and you-all are both open to it, why don't you

17   do it instead of maybe the appraisal and waiting and doing the

18   abatement?

19          And you're right.  It doesn't have to be exclusive

20   but if you-all are ready to go to mediation, go.  Right?

21          **MR. CHRISS:**  I'm happy to do that, Judge, and we'll

22   file our motion to compel appraisal and the Court can take it

23   up in due course and if we settle the case, fine and if we

24   don't, that's fine too.

25          **THE COURT:**  And we can address that.  It can be

1   pending pending mediation, I guess.  So do you-all want to then

2   -- are -- would you-all agree on a mediator or are we going to

3   have to work through that together or where are you-all?

4         **MR. DENNIS:**  We could discuss that after we finish

5   here today, your Honor.  I mean, we're here.  There's no point

6   not to.

7         **MR. CHRISS:**  Actually, we're going to go to mediation

8   and we're here.  Rather than delay the matter trying to figure

9   out between here and New York who we're going to use as a

10  mediator, I'd rather just let the Court know now we'd be

11  opposed to mediating the case anywhere but Corpus Christi and

12  we would prefer to have the mediator somewhere, you know,

13  within 50 miles of here who understands Hurricane Harvey

14  claims.

15        And there are a number of good, local mediators who

16  have mediated these Hurricane Harvey cases before.  Mr. Lehrman

17  has done it and there are others.

18        **MR. DENNIS:**  We are not opposed, your Honor, to

19  mediating in the area of Corpus Christi.  Houston is another

20  possibility since there are many mediators that are based out

21  of Houston.  I don't think that we would drag everybody up to

22  New York for a mediation in New York.  So I don't have any

23  problem with doing it down in this area.

24        **THE COURT:**  So agreement to mediate here.  And then

25  what about mediators?

10

1          **MR. DENNIS:**  That -- we have a few people that we

2  have used on various matters in this area and we can --

3          **THE COURT:**  Like who?

4          **MR. DENNIS:**   Greg Thompson is one of them.

5          **MR. CHRISS:**  I've used him before and he's terrible,

6  Judge.  We can't agree to him.

7          **THE COURT:**  Okay.  And --

8          **MR. CHRISS:**  We had a case not settle with him.

9          **MR. DENNIS:**  Well, the fact that a case did not

10  settle --

11          **THE COURT:**  Okay.  Wait.  I'm just -- let's go down

12  names.  Maybe we can agree on one.

13          **MR. DENNIS:**  Well, your Honor, then I will go back to

14  my office and collect up the rest of the names.

15          **THE COURT:**  Okay.  So you-all will continue visiting

16  about that?

17          **MR. DENNIS:**  Uh-huh.

18          **THE COURT:**  So when are you-all looking at mediation,

19  like within the next -- how many -- by when?

20          **MR. DENNIS:**  I think we could probably get it done --

21  I have -- you know, since we don't have a mediator, we don't

22  have a calendar yet but I would think that by December 15th, it

23  should be done.  November is a little bit of a tough month

24  because it's truncated and I think most mediators need more

25  than 21 days or so notice.

1     **MR. CHRISS:**  Yeah.  But I think the main problem

2 we're going to have, Judge, is not that we're not ready to go

3 talk.  The main problem is going to be getting somebody good

4 who's got a date available.  I know that, for example,

5 Mr. Lehrman here in Corpus Christi, you -- usually you've got

6 at least a two-month wait.  The same thing with David Dunn.

7 We'd be agreeable to him.  I don't think Mike Elliott is doing

8 these anymore.  So that's -- the problem's not that we're not

9 ready to talk.  The problem is that --

10          **THE COURT:**  Finding a mediator.

11          **MR. CHRISS:**  -- it's going to take us a while to get

12 a mediator.

13          **THE COURT:**  As to when you can get it done.

14          **MR. CHRISS:**  Right.  Could I just ask one thing of

15 the Court?

16          **THE COURT:**  Yes.

17          **MR. CHRISS:**  Your Honor, would the Court be willing

18 to appoint us a mediator if we can't agree on one?

19          **THE COURT:**  Yes.

20          **MR. CHRISS:**  Okay.

21          **THE COURT:**  Yes.  I just -- you know, I let you-all

22 try to agree first.

23          **MR. DENNIS:**  That's the preferable and usual route,

24 your Honor.

25          **THE COURT:**  Yes.  Okay.  Then if you don't agree,

1   I'll appoint a mediator.  So maybe shall I give you-all a week

2   to try to find someone and agree on someone?

3          **MR. CHRISS:**  Yes, Judge.  That will be fine.

4          **MR. DENNIS:**  How about -- your Honor, could we just

5   have ten days?  I need one day to get back to my office to do

6   this.

7          **THE COURT:**  That's fine.  So ten days.  Okay.  So

8   let's see.

9          **MR. CHRISS:**  And if we can't agree, Judge, then one

10  of us will file a motion to appoint.

11         **THE COURT:**  Okay.  Or just let Brandy know.

12         **MR. CHRISS:**  Oh, yeah.  Okay, we'll just -- that'd be

13  great.  We'll just email Brandy.

14         **THE COURT:**  Okay.  So just -- there were a couple of

15  issues I think we need to address before we really hit the

16  motion for protection, motion to compel.  And one of them was

17  what law controls the Work Product Doctrine and I actually

18  ruled on this before, I believe, and the Court finds that the

19  Federal Work Product Protection under Rule 26(b) applies here

20  rather than the State rule.  So I think that should at least

21  help us move now past that.

22         **MR. CHRISS:**  Was the provision of the Texas Rules

23  provide that it is a privilege something that the Court

24  addressed in that case?

25         **THE COURT:**  I don't know that I addressed it exactly

1    in that case.  So I've just kind of gone through a -- I've

2    reviewed, researched and looked at other cases and all your

3    briefing.  And I think the Court's going to say Federal -- the

4    Federal rule applies here rather than the State.

5          If you want to make any other comments, I am.  I'm

6    going to let you-all know where I'm at and then if you want to

7    comment further, you can.

8          **MR. CHRISS:**  I have nothing to add to our briefing on

9    the subject, Judge.  I would just point out that all the cases

10   that are cited to the Court, none of them deal with the fact

11   that the Texas Rules of Civil Procedure specifically provide

12   that Texas Work Product privilege is a privilege and the

13   Federal Rules provide that State law governs the application

14   privileges.

15         **THE COURT:**  Yeah.  I looked at all that.

16         **MR. CHRISS:**  Okay.

17         **THE COURT:**  So I'm going to stick with that.

18         Then I think there were issues in terms of the

19   privilege log that was provided by the Plaintiff and dates that

20   we're looking at as to when that work product protection should

21   come into play.  So I think the privilege log was probably a

22   little vague in terms of -- I need to go back and find exactly

23   how the Plaintiff worded some of the privileges that in terms

24   of just attorney-client privilege or material prepared about

25   the suit after litigation was anticipated.

14

1          I don't know that that gives enough for the Defense

2   to determine if there's something there that they need to seek

3   or request.  Do you want to comment on that, Mr. Chriss?

4          **MR. CHRISS:**  Two things, Judge.  First of all, that's

5   not the only information given.  We also gave them the date of

6   the communication and the person -- the persons who were

7   involved in the communication.

8          **THE COURT:**  Right.  But you need to be detailed about

9   -- you need to be detailed without giving your privilege away

10  but enough for them to know, okay, what is it basically.

11         **MR. CHRISS:**  Well, then I would request from the

12  Court some time to do that, especially given the fact that the

13  evidence that we presented to the Court in support of our

14  motion for protection indicates that, you know, we're dealing

15  with a vast corpus of material.

16         **THE COURT:**  Yeah, I know and I'll get to that in a

17  minute in terms of some of the requests.

18         **MR. CHRISS:**  I mean, we've already produced hundreds

19  of thousands of pages of documents.  And so I would just -- if

20  the Court's going to rule that way, I would just ask for some

21  indulgence.

22         **THE COURT:**  Oh, no, definitely.  I'll just -- and

23  then we need to look at the dates as to when -- anticipation of

24  litigation, I know Plaintiff was arguing the March 18th date.

25  We have that kind of starting off to Defendants going, well,

1    when the lawsuit was filed, which is way too far down, and then

2    there's other dates in there as to when different things

3    happened.  So I believe maybe March 8th was when maybe legal

4    counsel was first brought up at a board meeting.

5              **MR. CHRISS:**  That's correct.

6              **THE COURT:**  And then we have something in April

7    where --

8              **MR. CHRISS:**  Where I was hired.

9              **THE COURT:**  -- an attorney was retained at that

10   point.  Then the Defense rejects in July --

11             **MR. CHRISS:**  Then we filed a --

12             **THE COURT:**  -- I believe.

13             **MR. CHRISS:**  Yes.  We filed a pre-suit notice and a

14   proof of loss indicating that we would file suit and then we

15   received a negative response.

16             **THE COURT:**  Right.  Which I believe was late July.

17             **MR. CHRISS:**  Yes.

18             **THE COURT:**  And then the suit was filed in September.

19   So do you want to say something, Mr. Dennis?

20             **MR. DENNIS:**  No, I believe that your Honor has the

21   chronology roughly correct and we have not asserted a position

22   as to when Plaintiff anticipated litigation because of what

23   they are arguing that in some ways, the date is almost

24   irrelevant.  So we can address that.

25             **THE COURT:**  Well, doesn't it go the privilege log in

1    terms of what the Plaintiff was saying, when they have to get

2    more detailed or --

3         **MR. DENNIS:**  The Plaintiff's position, as I

4    understand it, your Honor, is that once they anticipated

5    litigation, every communication of mine, the shareholders, the

6    board of directors, any communication between a board of

7    director member and a consultant or anybody about the issues or

8    the facts related to this claim and this action are work

9    product protected.

10        Now, our main argument is that that can't possibly be

11   correct as a work product argument given the scope of the

12   Federal Rules of Work Product protection.  A document, in order

13   to be within work product protection, has to have been created

14   primarily for the purpose of litigation.

15        **THE COURT:**  Right, I don't know.  Is it the

16   Plaintiff's position that every single thing after that date is

17   necessarily privileged?  That's not the way I read --

18        **MR. CHRISS:**  No, your Honor, that's not our position.

19        **THE COURT:**  Yeah.

20        **MR. CHRISS:**  We've produced --

21        **THE COURT:**  Yeah.

22        **MR. CHRISS:**  -- thousands of pages of documents after

23   that date.

24        **THE COURT:**  Right.  That's not the way I read that.

25        **MR. DENNIS:**  It is their position, your Honor.

1        **THE COURT:**  No, he just said it's not.

2        **MR. DENNIS:**  He said they produced thousands of pages

3    of documents but those are invoices and bills.  Plaintiff's

4    position is that we can have all the invoices and bills after

5    March 8th, 2018 that we want but if we ask a board of director

6    member, did you discuss the windows and doors on May 15th,

7    2018, it's Plaintiff's position that that discussion is work

8    product and the same as to any discussion by any person or

9    board of director member at Sandpiper with any other

10   consultant.  Anything that a representative, as they call it --

11   but any person on behalf of the Sandpiper said anything to

12   another person about this claim after March 8th, according to

13   Plaintiffs, is work product protected.

14       **MR. CHRISS:**  That's actually not quite what we're

15   saying, Judge.  What we're saying under the cases that we've

16   cited to the Court in particular, the *In Re: Grand Jury*

17   *Subpoena* case.  What we're saying is that internal

18   communications between representatives of my client and/or

19   their consultants is work product privilege because those

20   communications would not have happened if we were not involved

21   in litigation and that's what the *In Re: Grand Jury Subpoena*

22   case says.

23       We are not withholding communications between my

24   client and their repair contractors.  We're not withholding

25   photographs.  We're not withholding any other materials other

1    than materials that are either attorney-client privilege or

2    that would be privileged as work product under the *In Re: Grand*

3    *Jury Subpoena* case.

4         **MR. DENNIS:**  The *In Re: Grand Jury* -- there is not a

5    single case that Plaintiffs decided that support their

6    position, not one.

7         **THE COURT:**  Okay.  There is going to be documents

8    that are going to be covered by the work product privilege

9    after a certain date.

10        **MR. DENNIS:**  They may be, your Honor, but they are

11   not board of director meeting minutes talking about how we're

12   going to repair windows and doors.

13        **THE COURT:**  Okay.  Well, they may be so but you're

14   talking in terms of everything and we can talk about board of

15   director meetings and we can talk about -- I believe there were

16   some emails but that's not the way you characterized this.

17        **MR. DENNIS:**  Well, I think it's pretty close, your

18   Honor.  Mr. Chriss just said, well, that's not exactly what

19   we're saying but it's very close.  And the borderline, I don't

20   really understand but it's not a major difference.  How I just

21   described their position is, I believe, materially correct.

22        **THE COURT:**  Okay.  So I need establish a date and I'm

23   going to let -- Mr. Chriss, if you want to argue -- I know you-

24   all were looking at March 8th and you-all said, if not, then

25   July 24th or something.

1          **MR. CHRISS:**  Actually, your Honor, our position is

2    that March 8th is the date when my client began to anticipate

3    litigation.  That's reflected in the board minutes the Court's

4    already seen.  That's when they made the decision to begin

5    interviewing lawyers to proceed with litigation.  They actually

6    hired us -- I've also told the Court when we were interviewed.

7    I think we were interviewed in late March.  I could be wrong

8    about that.  It might have been early April because I know we

9    were hired April the -- I think it was the 13th or maybe the --

10   I can't remember the exact date.

11          But it's just -- it defies logic that they -- that my

12   client could have not anticipated litigation sometime during

13   that period of time when they hired us on a contingent-fee

14   basis to proceed with litigation.

15          So the second the thing I would want to raise that I

16   forgot to mention earlier, Judge, is this.  One of the aspects

17   of my motion for protective order is simply a -- if you like

18   Kant's categorical imperative, I prefer what is sauce for the

19   goose is sauce for the gander.  And that is this, the Defendant

20   has not produced any privilege logs after the date that the

21   suit was filed but they require -- they're requiring us to

22   produce privilege logs ad infinitum.  And most of the privilege

23   logs that we've produced -- and they actually fill up this

24   briefcase.  There are hundreds of pages --

25          **THE COURT:**  There's a lot of documents here.

1      **MR. CHRISS:**  Yeah, there's hundreds of pages.  Most

2  of those deal with documents that were generated after the suit

3  was filed.  So if we're going to have a rule that we don't have

4  to produce privilege logs after suit was filed, I'm merely

5  asking the Court -- I think that's a reasonable rule and I'm

6  asking the Court if I can take the benefit of that same rule.

7      **THE COURT:**  Well, is that what you're doing?

8      **MR. DENNIS:**  No, your Honor.  I don't want any more

9  privilege logs.  I haven't asked Mr. Chriss for a privilege log

10 after the commencement of this litigation.  There's no motion

11 to compel a privilege log.  I don't want any more privilege

12 logs.  Mr. Chriss voluntarily produced a privilege log all on

13 his own.

14     **THE COURT:**  Because if he's going to -- the Rules

15 require that.

16     **MR. DENNIS:**  Yes, but there was -- he didn't call me

17 up beforehand and say, is this the date we're going to use or

18 some other date that we're going to use.  If -- he produced the

19 privilege log --

20     **THE COURT:**  Are you holding back documents and have

21 you filed a privilege log if you are?

22     **MR. DENNIS:**  Yes, we have and --

23     **THE COURT:**  Where is it?  He said he doesn't have it.

24     **MR. CHRISS:**  No, no.

25     **MR. DENNIS:**  Yeah --

1          **MR. CHRISS:**  They've produced the privilege log.

2     They just --

3          **THE COURT:**  After --

4          **MR. CHRISS:**  Correct.

5          **THE COURT:**  -- after the suit date?

6          **MR. CHRISS:**  And so the Court's just indicated a few

7     minutes ago that the Court would like me to be more specific

8     with respect to my privilege logs.  I understand that ruling

9     and I will comply.  I'm merely --

10         **THE COURT:**  We're trying to find the date now.

11         **MR. CHRISS:**  I'm merely asking that I not have to do

12    that with respect to privilege logs after the day that the suit

13    was filed because they're apparently in agreement that that's a

14    reasonable rule.

15         **MR. DENNIS:**  Agreed.

16         **THE COURT:**  Okay.

17         **MR. CHRISS:**  Okay.  So now we're --

18         **THE COURT:**  So we're just trying now working back to

19    the dates?

20         **MR. DENNIS:**  Yes.

21         **THE COURT:**  Because, obviously, date of suit is too

22    late.  So do you want to comment, Mr. Dennis?

23         **MR. DENNIS:**  Yes, your Honor.  I have in front of me

24    the March 8th meeting minutes that were relied on by Plaintiff.

25    I would first point out that there's no affidavit before the

22

1    Court from anybody on behalf of Sandpiper, any board member,

2    any management company, anybody saying that they anticipated

3    litigation on March 8th.

4         If this was such a magic date, such a momentous

5    occasion, one would certainly think that it would simple enough

6    to get a witness to say that but there is none.  There is not

7    been any piece of evidence given to this Court to establish

8    anything.  And the March 8th meeting minutes -- I'm going to

9    read from the unredacted or the only marginally redacted piece.

10        It says in its entirety, "Mr. Trump (phonetic)

11             Crawford (phonetic) explained that all CCMS managed

12             properties are experiencing the same troubles with

13             insurance companies and that has been a very slow

14             process.  In his experience, dealing with insurance

15             companies post-Hurricane Harvey, having a legal

16             entity initiate communication with insurance tends to

17             help speed up the process.  Colonel Michael Smiley

18             suggested that after listening to the board's

19             discussion, a public adjustor or a lawyer is needed."

20        There's no discussion here about retention of

21    counsel.  If this -- yeah, the next paragraph I don't have but

22    even if they were retained, the cases all hold that the mere

23    retention of counsel does not establish anticipation of

24    litigation.

25             **THE COURT:**  Okay.  I want Mr. Chriss to respond but

1    I'm certainly looking no later than July 24th when you-all

2    rejected the claim but do you want to respond, Mr. Chriss?

3         **MR. CHRISS:**  Yes, your Honor.  If I might just

4    correct my friend here.  I'm sure it was inadvertent on his

5    part but if you look, you'll find that Exhibit E to our motion

6    for protective order, I believe, with respect to -- I believe

7    it's with respect to the subpoenas is an affidavit from English

8    Allbritton who is the building manager at Sandpiper and on Page

9    2 of that affidavit, second paragraph, we have a statement that

10   is evidence that has not been contradicted by anyone.

11        "When it became clear that Lexington would not pay

12        the full cost of removing and replacing the windows,

13        curbs, sliding glass doors, unit entry doors and

14        several other aspects of the hurricane damage to the

15        building, Sandpiper decided to hire an attorney and

16        pursue litigation.  The decision to proceed in this

17        manner was initially made at the March 8th, 2018

18        board meeting.  It was quickly determined that

19        litigation would be necessary.  The idea of hiring a

20        public adjustor was not pursued and Mr. Chriss and

21        Ms. Snapka were interviewed by the Sandpiper board on

22        April the 4th of 2018."

23        So there is evidence before the Court that either on

24   March the 8th or certainly no later than April the 4th of 2018,

25   Sandpiper anticipated litigation.

1          **MR. DENNIS:**  Your Honor, I would point out that the

2    March 8th meeting minutes have no such statements in them.  I

3    just read the entirety of the unredacted statement.  There's a

4    paragraph after --

5          **THE COURT:**  All right.  You were complaining that

6    there was no evidence by anyone.  So he pointed out --

7          **MR. DENNIS:**  That's right, your Honor.

8          **THE COURT:**  -- there was that affidavit.

9          **MR. DENNIS:**  Okay.

10          **MR. CHRISS:**  And I would just point out, Judge,

11   this --

12          **THE COURT:**  Okay.  I would like --

13          **MR. CHRISS:**  All right, go ahead, Judge.  I'm sorry.

14          **THE COURT:**  I've heard enough.

15          **MR. CHRISS:**  No problem.

16          **THE COURT:**  I'm going to set the date.  Litigation

17   was anticipated as March 8th, 2018.  So then that triggers --

18   we need to talk about then because I'm not sure we're real

19   clear on the privilege logs then.  Are we saying after that

20   date, what are you-all wanting to do?

21          **MR. CHRISS:**  I believe what we -- I think if I heard

22   correctly what we kind of all have come to a consensus about is

23   that I should be more specific in my privilege logs between

24   March the 8th of 2018 and the date that suit was filed and that

25   I did not --

1          **MR. DENNIS:**  We agreed --

2          **MR. CHRISS:**  -- supplement it after that date.

3          **MR. DENNIS:**  -- we agreed on the cutoff date and the

4    Court has indicated that it will require those further logs be

5    produced.  So when the log is produced, we'll take a look at

6    it, see what we can do, call up Mr. Chriss.  If we have any

7    more issues, we'll try to work them out.

8          **THE COURT:**  Okay.  So let's go to the motion for --

9    it was all part of it but I thought if we could clear up those

10   issues, it might make things a little easier to get through.

11   On the Plaintiff's motion for protection then, for discovery

12   and the motion -- and to modify or quash the subpoenas of the

13   three individuals.  And I -- we can do this -- I do think there

14   are several here that when I looked through them I think are

15   overbroad.  There were some that I thought were not.  And there

16   was a couple that had some mixed questions.

17          So I can let you know the ones I think are overbroad

18   and, Mr. Dennis, you can let me know why they're not and then

19   vice versa.  So let me pull those.  Okay.  These are the ones I

20   think from the subpoena -- because all three were the same,

21   right?

22          **MR. DENNIS:**  Yes, your Honor.

23          **THE COURT:**  It was -- I just went through one of

24   them.  It's request -- these are the ones that I think are

25   overbroad.  They refer kind of to policy, property, some

26

1  general phrases, no time limitation, no particular request,

2  probably going to include a multitude of documents which are 1,

3  12, 13, 17, 24 and 25.

4       So, Mr. Dennis?

5       **MR. DENNIS:**  Yes, your Honor.

6       **THE COURT:**  Do you want to -- let me find those.

7       **MR. DENNIS:**  With regard to there not being a time

8  limitation --

9       **THE COURT:**  I'm sorry.  What are you saying?  I'm

10  congested.  So I'm having a little trouble --

11       **MR. DENNIS:**  I'm sorry.  I'll speak up, your Honor.

12       **THE COURT:**  That's good, yes.

13       **MR. DENNIS:**  With regard to a time limitation related

14  to all documents concerning policy, the policy itself except

15  incepted --

16       **THE COURT:**  Okay, that's fine.  But all documents

17  concerning the policy, that's broad.

18       **MR. DENNIS:**  Okay.  We would be willing to narrow

19  that, your Honor, to all documents concerning the policy with

20  regard to this loss.

21       **THE COURT:**  With regard to the loss?

22       **MR. DENNIS:**  Yes.

23       **THE COURT:**  Oh, I'm looking at Mr. Chriss.

24       **MR. CHRISS:**  Uh --

25       **THE COURT:**  I mean, that narrows it --

1          **MR. CHRISS:**  That -- yeah, that sort of -- that's the

2  same as --

3          **THE COURT:**  Goes with the other ones.

4          **MR. CHRISS:**  -- all documents regarding this loss.

5  It's equally broad.  I mean, that's the problem here and we've

6  cited the Court to several cases that say you just can't do

7  this.  You have to tell me what it is that you're looking for.

8  You can't just say, give me all the documents about Sandpiper.

9  Give me all the documents about your claim.  Give me all the

10  documents about your damages.  You can't do that.  It's not

11  allowed.

12          **MR. DENNIS:**  First of all, your Honor, these

13  documents have already been collected and are -- supposedly are

14  going to be produced to us --

15          **THE COURT:**  Okay.  Then why I am doing this?  I'm

16  really busy.

17          **MR. DENNIS:**  I don't know.  Mr. Chriss told --

18          **THE COURT:**  I'm really busy.  If you-all don't

19  need --

20          **MR. DENNIS:**  -- Mr. Chriss told us and he told the

21  Court in his reply papers on this motion that all of these

22  documents, responsive documents had been collected and will be

23  produced to us.  He says --

24          **THE COURT:**  Well, he objected to things.  So if you

25  want that -- if you're okay with that, with his objections and

1   everything he gave you, then let's just stop this right now.

2          **MR. DENNIS:**  Well, the reasonable --

3          **THE COURT:**  I mean, if you're okay with that, I am.

4          **MR. DENNIS:**  -- the reasonable place to start, your

5   Honor, was if we serve subpoenas and if they have collected

6   documents, then we should have -- these would have been

7   produced back in July when they were collected and we probably

8   could have worked this out by now.  I don't know why they

9   haven't been produced.

10          **THE COURT:**  Well, I thought -- anyway --

11          **MR. CHRISS:**  Your Honor, the reason they haven't been

12   produced is because the Rules specifically provide that when a

13   subpoena is issued invoking the contempt power of the Court,

14   the respondent need not produce documents if that subpoena is

15   clearly overbroad in its face, which this one is.  We have

16   collected documents from these witnesses and we believe them to

17   be complete because we asked them, this is to provide us with

18   this information.

19          We haven't been through all the documents because we

20   are under no obligation to produce them and I just want to --

21   until these objections are resolved and I just want to mention

22   one other category of documents, your Honor, that's in the

23   subpoenas that the Court -- it wasn't on the Court's list, just

24   to have them --

25          **THE COURT:**  And we can work through the other ones.

1    These were just kind of very obvious to me, you know.

2            **MR. CHRISS:**  Right.  Okay.  Then if you want me to

3    hold that thought, I will.

4            **THE COURT:**  Yeah.

5            **MR. DENNIS:**  We can -- so Number 1, your Honor, we

6    would limit that way because the loss has an obvious starting

7    date and to say that the loss is not relevant, you know, really

8    is a little bit much.  So that takes care of the time

9    limitation with regard to Number 1, I believe, which was the

10   Court's issue.

11           With regard --

12           **THE COURT:**  That wasn't the only issue.

13           **MR. DENNIS:**  Okay.  But if your Honor has -- we can

14   work through it.  I'm willing to go through this with the

15   Court.  With regard to Number 12, "All documents relating to

16   Hansen's work on the property."  Okay.  Hansen is one of the

17   contractors that has worked at the property.  There are

18   specific time periods when Hansen has worked on the property

19   and if we wanted to put a time limit on that pre-loss, we would

20   be willing to do so.  We could go back to -- for instance, this

21   loss was in 2017.  We can go back to 2010 if that would satisfy

22   the Court or we could do 2012 or something like that.

23           **MR. CHRISS:**  Your Honor, we -- Counsel knows this.

24   We objected to producing Hansen documents and Hansen has

25   produced -- from what we've been told in response to the

1   subpoena that was directed to them, they have produced all of

2   their documents prior to March the 18th of 2018.  They've

3   already produced them.

4           **THE COURT:**  Waive -- no limitation on the time?  They

5   just produced everything?

6           **MR. CHRISS:**  Right, all the way as far back as their

7   records go.

8           **THE COURT:**  Okay.  Do you have that already?

9           **MR. DENNIS:**  We have -- yes, we have documents from

10  Hansen, your Honor.

11          **THE COURT:**  Okay.  So what --

12          **MR. DENNIS:**  The question is, what did these three

13  board members discuss with Hansen regarding his work relating

14  to this loss and this property?  We have Hansen documents, yes,

15  but we also asked Sandpiper for documents relating to Hansen

16  and they produced none.  And so this is just the same question.

17  It's a different set of documents.  So that's why we have

18  Hansen here.

19          **MR. CHRISS:**  And see, this is why proportionality and

20  burden are important, Judge.  How is Mr. Ramichiati (phonetic),

21  for example, supposed to know whether a document relates to

22  Hansen?  I mean, what does that mean?  If he's asking for

23  communications with Hansen, they've already been produced

24  because Hansen produced them.

25          **MR. DENNIS:**  Your Honor, it's fairly clear what

1    Hansen did on the project.  Mr. Ramichiati is familiar with

2    that, as are the rest of the board members.  So that issue is

3    more hypothetical than realistic.

4              **MR. CHRISS:**  See, this --

5              **MR. DENNIS:**  Plus -- and I would point out,

6    Mr. Ramichiati has not submitted any affidavit on these points.

7              **MR. CHRISS:**  Actually, Mr. Ramichiati has produced an

8    affidavit.  It's attached to the Court -- to my motion before

9    the Court.  I believe it's Exhibit F.

10             **MR. DENNIS:**  It did not address whether or not

11   Mr. Ramichiati has any other standing of any -- of this

12   document request or any other document request.

13             **MR. CHRISS:**  Judge, this is why we're demanding

14   appraisal is because he just got through saying that it's

15   pretty clear what Hansen did at the property but he won't stop

16   making these requests for discovery that are running up massive

17   costs and time expenditure and running off contractors from the

18   Sandpiper who don't even want to work there anymore because

19   they all keep getting subpoenas.  All we're asking is that the

20   case be resolved based upon the facts, not based upon fishing

21   expeditions.

22             **THE COURT:**  Okay.  If you-all can't -- it's

23   overbroad.  If you-all can't agree on how to modify it, then

24   it's overbroad, not allowed.  Okay.

25             **MR. DENNIS:**  13, your Honor, is, "All documents

1    related to estimates and/or work by the following entities at

2    the Sandpiper property."  And there are one, two, three, four

3    of them.  Each of them has been involved with the repair work

4    at the property and so it's no time issue with regard to them.

5    It's documents related to estimates and/or work by the

6    following entities.  It's not a generalized document request.

7            Each of those folks, Lee Little, Hansen, Harvest and

8    Taylor Mays (phonetic), which is TMC, are specific contractors

9    who have done specific things who have negotiated contracts

10   with Sandpiper and so the board of directors know who they are.

11   And so 13 is also limited by the actual facts on the ground.

12           **THE COURT:**  All right.

13           **MR. CHRISS:**  And once again, your Honor, he has all

14   of Lee Little's estimates.  He's subpoenaed them.  He

15   subpoenaed all of the records that he is now seeking to have

16   these individuals search their cell phones and their laptops

17   for.  A document that's related to an estimate is not relevant

18   to anything in this case.  All that matters is what the

19   estimate is and how much it cost to fix the building.  That's

20   all we're trying to get to, is give us the money to fix the

21   building and stop all of this Rambo stuff.

22           **MR. DENNIS:**  That's what Mr. Chriss thinks the case

23   is about, your Honor, and I understand that.  But if there are

24   documents in this case where they talk about how much money

25   they're spending -- we're spending five and half million

1  dollars to replace windows or curbs which we've now discovered

2  were leaking like sieves ten years before Harvey, that -- those

3  documents are relevant.

4         It is relevant to determine whether -- or what are

5  you picking off of Lee Little or what are you picking off

6  Harvest to do and why are they doing this and not that which

7  costs half as much?  That's the -- I understand that Mr. Chriss

8  wants to turn to me and give me a bill but that's not the limit

9  of discovery here, your Honor.

10        **THE COURT:**  Okay.  But another issue is too, he's

11  saying you already have this.

12        **MR. DENNIS:**  We have the documents from these

13  contractors.  That's true.  And we went to Sandpiper to get

14  Sandpiper's documents which we're also entitled to and when we

15  asked, well, did you ask your board members for documents, the

16  answer is, well, asked and one of them kind of gave us

17  something.

18        So we didn't go around Rambo style and subpoena every

19  board member.  We picked the three out of the 115 people that

20  Sandpiper identified in their mandatory disclosure.  So this

21  isn't a Rambo issue and, yes, we have documents from the

22  contractors but we're also entitled to the documents from the

23  folks on the other side.

24        **MR. CHRISS:**  And my response, Judge, is why?  I don't

25  understand this.  Mr. Ramichiati is not an expert.  Mr. Smiley

1   is not an expert -- Colonel Smiley is not an expert.

2   Dr. Mansuto (phonetic) is not an expert.  So if Dr. Mansuto

3   sends a text to Mr. Ramichiati that says, yeah, talked to Lee

4   Little today.  He sent us his estimate, that's not relevant to

5   anything.  But I've got to go search for it because of the

6   overbroad nature of the request.

7             **MR. DENNIS:**  It is relevant --

8             **MR. CHRISS:**  It's not relevant to anything.

9             **MR. DENNIS:**  It is relevant.  You don't have to be an

10  expert.

11            **THE COURT:**  Okay.  Overbroad.  If you-all want to

12  figure out how to limit it, go ahead.  I'm not going to sit

13  here and babysit every single one of these.  You-all are just

14  going to argue and argue and I think --

15            **MR. DENNIS:**  Okay.

16            **THE COURT:**  -- you-all are going to mediation anyway

17  and you-all tell me you-all have everything you need already.

18  So -- but we can go forward.

19            **MR. CHRISS:**  Judge, the next one that we would ask

20  the Court to look at, I believe it's Number 15.

21            **THE COURT:**  Well, 15 I showed here was mixed because

22  you, again, have the policy, the property, all documents which

23  I kind of already covered, I guess, in the first one.

24            **MR. CHRISS:**  Yes, Judge, but it also specifically

25  requests communications with me.

1          **MR. DENNIS:**  We went through that.

2          **THE COURT:**  Well, I thought that the Defense said,

3    we're not doing that anymore.

4          **MR. DENNIS:**  We went through that.

5          **THE COURT:**  In the briefing, I thought it was

6    withdrawn, anything with counsel.

7          **MR. CHRISS:**  Okay.  I just want to make sure.

8          **THE COURT:**  Okay.

9          **MR. DENNIS:**  17, your Honor, if I may.  The unit

10   entry doors, the terrace window and sliding glass doors are

11   pretty specific items out of the number that they're seeking

12   from us.  Collectively, that's about $6 million of the claim.

13   So I don't think that Number 17 is overbroad, particularly with

14   regard to the fact that the Sandpiper has for a number of years

15   told its unit owners that they are responsible for repair of

16   these items.  So that's why we asked for Number 17, your Honor.

17   I don't know if that affects your Honor's thinking in any way.

18         **THE COURT:**  Do you want to comment, Mr. Chriss, on

19   17?

20         **MR. CHRISS:**  All documents concerning the ownership

21   of or responsibility of the repair or replace or right to

22   modify these things?  That's a -- the right is a legal question

23   and it doesn't make any difference what board members say,

24   think or any of that with respect to what they've insured under

25   the policy.  They've insured those doors and windows under the

1    policy.  Why are we being asked to run through texts and emails

2    and stuff to try to produce this?  The Court's already

3    determined it's overbroad and I think it is.

4            **MR. DENNIS:**  We're not asking -- well, your Honor has

5    indicated that --

6            **THE COURT:**  Yeah, it's overbroad.

7            **MR. DENNIS:**  Okay.  24 we've actually discussed it

8    with regard to the motions to compel --

9            **THE COURT:**  Okay.

10           **MR. DENNIS:**  -- and otherwise.  So that's sort of

11   been taken care of.

12           **THE COURT:**  We can come back to that one, I guess,

13   when we go with the motion to compel?

14           **MR. DENNIS:**  I think so, your Honor.

15           **THE COURT:**  Yes.

16           **MR. DENNIS:**  And 25, I can't imagine that Mr. Chriss

17   and I are going to agree here to this.

18           **THE COURT:**  No, that's very broad.

19           **MR. CHRISS:**  Judge, if I --

20           **MR. DENNIS:**  So I have -- your Honor, I have 1, 12 --

21   just a minute -- 1, 12, 15 --

22           **THE COURT:**  1, 12, 13, 17 and on 15 -- 15 and 16,

23   there were a couple of things because there's subparts and for

24   sure, at least the 1 and 3 on both of those are broad.

25           **MR. DENNIS:**  Okay.  So I have 1, 12, 13.

37

```
 1            THE COURT:  7 --

 2            MR. DENNIS:  With regard to 15, it's Sub 1 and 3.

 3            THE COURT:  16, 1 and 3.

 4            MR. DENNIS:  16, 1 and 3.

 5            THE COURT:  I think it was 1 and 3.  And 17 --

 6            MR. DENNIS:  17, 24 and 25.  Is that --

 7            THE COURT:  That I just -- yes, those are overbroad

 8   and then there's other ones we can discuss.

 9            MR. DENNIS:  Okay.

10            THE COURT:  Okay?  So, Mr. Chriss, I guess I'll let

11   you address the others.

12            MR. CHRISS:  Yes, Judge.  The -- Number 17 -- I'm

13   sorry.  We already talked about that.  Number 18 -- and this is

14   my problem with all of these.  "All contracts, letters of

15   engagement, bids and any other documents."  Okay.  I produced

16   contracts, letters of engagements, bids concerning Sandpiper's

17   engagement of hiring or otherwise using the services of all

18   these people, including me, to the extent that they weren't

19   privileged.

20            But any other document concerning Sandpiper's

21   retention of 20 -- I guess it's 21 different entities is

22   overbroad.

23            THE COURT:  Okay.  Do you want to address that,

24   Mr. Dennis, and any other document?  He says he's produced

25   contracts, letters of engagement, bids.
```

38

1    **MR. DENNIS:**  Yes, your Honor.  The reason that we

2  sent these subpoenas out is that these documents -- these board

3  members either were not asked or did not provide any documents

4  to Mr. Chriss.  So of the universe of documents that he's

5  producing, these are not among them.  Now, there may be some

6  overlap.

7    **THE COURT:**  So you didn't get contracts, letters of

8  engagement or bids?

9    **MR. DENNIS:**  If they -- we got some data, your Honor,

10  yes, but the question is, is there a document, is there a

11  letter of engagement or a bid that is not among the documents

12  that Mr. Chriss has provided because he didn't get one?  Now,

13  if you want to strike "and any other document concerning" --

14    **THE COURT:**  Yes, we do.  Yes, we do.

15    **MR. DENNIS:**  Okay.

16    **THE COURT:**  So all contracts, letters of engagement

17  and bids, right, Mr. Chriss?

18    **MR. CHRISS:**  That's correct, your Honor.

19    **THE COURT:**  Yes.

20    **MR. CHRISS:**  And I would just point out, Subsection B

21  says, "Any board member."  "All contracts, letters of

22          engagements, bids or any other documents concerning

23          Sandpiper's engagement of or otherwise using the

24          services of a board member."  That's basically every

25  document in the Sandpiper archive that involves a board member

39

1   doing anything.

2          **MR. DENNIS:**  No, it doesn't.  It's all relating to

3   the investigation and/or repair of Harvey-related damage.  The

4   whole question is limited to that.  It's not every document or

5   every board member registered.

6          **MR. CHRISS:**  But how are we supposed to determine

7   whether any board member has been engaged, hired or otherwise

8   used with respect to Harvey-related damage?  What does that

9   mean?

10          **MR. DENNIS:**  If there are no such documents, then

11   there are none.

12          **MR. CHRISS:**  But I have to see --

13          **THE COURT:**  Well, it's not about there not being any.

14   It's how do you go about -- with any board member, how do you

15   go about finding that?

16          **MR. DENNIS:**  It's all contracts, letters of

17   engagement, bids --

18          **THE COURT:**  He's saying any board member, that's too

19   many.  That's too much.

20          **MR. DENNIS:**  -- concerning Sandpiper's engagement or

21   using the services of a board member leading to Harvey-related

22   damages.  And it's any board member.  I don't -- it's a

23   limitation with regard to Doc 2, letters of engagement and

24   bids.

25          **THE COURT:**  So they hired a board member to do some

40

1    work.  Is that what you're saying?

2          **MR. CHRISS:**  Well, then just say "hired" though,

3    Judge.  It says --

4          **THE COURT:**  I know but I'm just trying to --

5          **MR. DENNIS:**  It says letters of engagement and bids

6    now relating to that topic and board members.  So, yes, your

7    Honor, that would be one of them but it's not something that's

8    overbroad or incomprehensible.

9          **THE COURT:**  Okay.  So the only way we're going to

10   modify 18 is we're getting rid of "and any other document."

11   Okay.

12          Anything else on 18, Mr. Chriss?

13          **MR. CHRISS:**  Yes.  Subsection Q regarding Plaintiff's

14   counsel.  I've already produced the contract by which we were

15   hired and I don't --

16          **MR. DENNIS:**  Withdrawn.

17          **THE COURT:**  Withdrawn.

18          **MR. DENNIS:**  Withdrawn.

19          **THE COURT:**  Yes.  Okay.  All right.  Where else,

20   Mr. Chriss?

21          **MR. CHRISS:**  Well, now we've got Number 19, Judge.

22   "All contracts, letters of engagement, bids and any other

23   document concerning hiring anybody else."  That's obviously

24   overbroad.

25          **THE COURT:**  Do you want to address that, Mr. Dennis?

41

1          **MR. DENNIS:**  Yes, your Honor.  We'll actually

2    withdraw 19 given what we've been through and where we are in

3    the litigation now.

4          **THE COURT:**  Okay.  All right, that's okay.  That's

5    okay.  Withdraw, you don't need to explain.

6          What else, Mr. Chriss?

7          **MR. CHRISS:**  Again, Number 20, "All documents

8    concerning any replacement or repair to any terrace window

9    and/or sliding glass door."  We have produced, I think, 19

10   years of maintenance records -- or 14 years of maintenance

11   records on this property.  I don't know how long these

12   individual board members have owned units at the Sandpiper.  I

13   don't know how I'm going to find documents that might have

14   something to do with some work that somebody did on some unit

15   going back to 2005.

16         **MR. DENNIS:**  This, your Honor -- your Honor, I think

17   this one requires a bit more attention.  We've discovered

18   through this case that the windows and the curbs at the

19   Sandpiper building have been the subject of constant attention

20   by the board from at least 2010 all the way up to Sandy and

21   including Sandy.

22         **MR. CHRISS:**  Actually I think you mean Harvey.

23         **THE COURT:**  Harvey.

24         **MR. DENNIS:**  It's going to happen sometime.  That's

25   all I can say.  I apologize.

```
 1              THE COURT:  The hurricane.

 2              MR. DENNIS:  Through Harvey.  So this is not an

 3    instance where we're just shooting out of the blue.  There

 4    are --

 5              THE COURT:  I mean, he's saying, we've produced a lot

 6    regarding that.  So what exactly --

 7              MR. DENNIS:  But this is a particular document

 8    request where an individual board member, one of these three,

 9    may actually have specific emails on this topic because this

10    was a hot topic at that building.  If we wanted to do -- if we

11    wanted to limit it in terms of time, I would limit it --

12              THE COURT:  But what documents are you looking for?

13              MR. DENNIS:  There were -- in several apartments,

14    there were efforts -- actually test runs in one or two

15    apartments to design a fix for the curbs so they would stop

16    leaking in 2010.

17              THE COURT:  So is that what you're looking for,

18    documents that talked about fixing --

19              MR. DENNIS:  We're also looking for the other

20    documents between these board members talking about the fact

21    that every time it rained strongly, the windows and curbs

22    leaked at this building because they want us to give them new

23    windows and curbs.  This is not a light weight request or

24    something that's very general.  These folks were constantly

25    talking about replacing or repairing the windows and the curbs
```

43

1  at that building because they leaked like a sieve.

2          **MR. CHRISS:**  And the reason he knows that is because

3  I've given them 14 years --

4          **THE COURT:**  Right.

5          **MR. CHRISS:**  -- of maintenance records and I've also

6  produced for deposition both of the maintenance personnel at

7  the Sandpiper who have testified and identified windows and

8  doors showing him exactly what he's just talking about.  One --

9          **MR. DENNIS:**  Actually, the reason I know is that we

10 deposed Dr. Gotley (phonetic) who went on in great length about

11 this.

12         **THE COURT:**  Okay.  You've got the information.  So --

13         **MR. DENNIS:**  But that's -- we're not limited to one

14 person, your Honor.  This is -- these are --

15         **THE COURT:**  Okay.  You need to limit your request.

16 So 20 is overbroad with "all documents concerning" going all

17 the way back to '05.  So --

18         **MR. DENNIS:**  We went to 2010, your Honor.

19         **THE COURT:**  Well, it's not the date, I think, is what

20 -- that's not the only complaint.

21         **MR. DENNIS:**  I -- your Honor, on this one, I think it

22 is the date.  This is not -- this is a 6 million-dollar issue,

23 your Honor.  I'm willing to compromise a lot of the other ones

24 because we've gotten a --

25         **THE COURT:**  I -- the concern is all documents

44

1   regarding X, Y and Z.  You really need to be more specific.

2   You've already gotten some information about this.  So there --

3   if you have some information, you should be able to not be so

4   broad in your request.

5          **MR. DENNIS:**  I don't think so, your Honor, because --

6          **THE COURT:**  Okay.

7          **MR. DENNIS:**  -- as I indicated, this was a topic of

8   constant conversation.  It was addressed at board meetings.  It

9   was addressed at annual meetings.  It was the subject of --

10          **THE COURT:**  Are you going to depose these people,

11   these three individuals or not?

12          **MR. DENNIS:**  We're going to depose at least one of

13   them, your Honor.  We're trying not to depose all of them.  As

14   we indicated to the Court, we've come up with a list of 12 fact

15   depositions.

16          **THE COURT:**  Yeah, we'll address that at the end of

17   the hearing.

18          **MR. DENNIS:**  Understood.  We're trying to chop this

19   thing down.

20          **THE COURT:**  Okay, anything else on that one, 20?

21          **MR. DENNIS:**  No, your Honor.

22          **THE COURT:**  Okay.  The Court finds it's overbroad.

23          **MR. CHRISS:**  Judge, I don't think we have any

24   objection to 22 which is photographs, videos or depictions.

25   21, 23, 24 and 25 --

1          **THE COURT:**  Okay.  25 I said was overbroad.

2          **MR. CHRISS:**  Yes, yes.

3          **THE COURT:**  24 we're going to address when we address

4     the motion to compel --

5          **MR. CHRISS:**  Right, okay.

6          **THE COURT:**  -- the Defendant's.

7          **MR. CHRISS:**  So then that just leaves "all documents

8     concerning" on 23 and "all documents concerning" on 21.  And,

9     again, I would just echo what the Court said.  I mean, there's

10    no reason why they can't be more specific about what it is

11    we're supposed to be looking for.

12         **THE COURT:**  Yes, I agree.

13         **MR. DENNIS:**  Your Honor --

14         **THE COURT:**  Yes.

15         **MR. DENNIS:**  -- fine.  We'll limit 23 and 24 -- 23 to

16    emails among board members.  As a matter of fact, we'll do the

17    same thing with 20.  If that's the Court's real concern, we'll

18    do the same thing for 20 and 23 -- limit them both to emails

19    among board members.

20         **THE COURT:**  Do you want to respond, Mr. Chriss?

21         **MR. CHRISS:**  Yeah.  All I can say to that, Judge, is

22    we will make a diligent effort through search engines and stuff

23    to try to --

24         **THE COURT:**  That's all you can do.

25         **MR. CHRISS:**  -- pull that out.

1          **THE COURT:**  That's all you can do.

2          **THE COURT:**  But we're talking about -- and submitted

3  an affidavit about how many emails we're talking about.

4          **THE COURT:**  So we're going to 2010 on those?

5          **MR. DENNIS:**  Well, on Number 20, emails, blah, blah,

6  blah from January 2010 to date.

7          **THE COURT:**  21, 2010?  I'm just asking if your dates

8  -- or no, I'm just asking about your dates on 20, 21 and 23.

9  Are you changing all of them to 2010 or just --

10          **MR. DENNIS:**  Yes, your Honor.

11          **THE COURT:**  Okay.  All right.  And then what else do

12  we need to address on those, Mr. Chriss?

13          **MR. CHRISS:**  Okay.  We're just -- and those are all

14  limited to emails; is that right?

15          **THE COURT:**  That's what he limited it to.

16          **MR. CHRISS:**  Okay.

17          **THE COURT:**  Yes.  Any other ones we need to -- any

18  other numbered requests we need to address?

19          **MR. CHRISS:**  Not in terms of over-broadness, your

20  Honor, just -- you know, we just have this -- we have the same,

21  you know, privilege argument that we made before that the

22  Court's already discussed.  You know, I don't know where we --

23          **THE COURT:**  Okay.  Then I'm going to move to the

24  Defendant's motion to compel and I know that regards -- I guess

25  we were looking at Request 24, some board meetings.  And I'm

1   going to let Mr. Chriss respond because I didn't see where the

2   board meeting minutes -- I got -- I was looking at the -- there

3   were two redacted versions of one that wasn't so redacted, I

4   guess.

5          I didn't think they were privileged, more protected

6   under the Work Product Doctrine.  I thought those were things

7   that were going to be done anyway.  They weren't done in

8   anticipation of litigation.  So that's where I'm inclined to

9   go.  So I'll let you start first.

10          **MR. CHRISS:**  Sure.  A couple, three things.  Number

11  one, I'm not quite sure what happened with respect to more

12  deletions versus the previous of not having as many deletions.

13  As the Court can probably tell, I'm dealing with a lot of

14  documents.

15          **THE COURT:**  Oh, yes, I know.

16          **MR. CHRISS:**  That's number one.  Number two, the

17  reason for the more redacted version is twofold.  First of all,

18  the Texas privilege argument that the Court's already rejected

19  and, secondly, the Federal Work Product Doctrine argument under

20  the *In Re: Grand Jury Subpoena* case that is supported by

21  evidence in the form of two affidavits that we've submitted to

22  the Court that have not been contradicted that have -- that are

23  telling the Court that this is not ordinary business for

24  Sandpiper.

25          The first six months after this hurricane, Sandpiper

1    did whatever the insurance company told them.  The insurance

2    company came in and specified and dictated to them what the

3    scope of repair would be, went and talked to their contractor

4    directly and told him what to remove and not to remove, left a

5    whole bunch of water damaged building materials in the

6    building.

7              And then in March of 2018 when my client began to

8    anticipate litigation, Lexington says, that's it.  We're not

9    paying any more money.  So I hope your building is fixed.

10   That's essentially what happened.

11             And after that point and after the point of hiring us

12   as attorneys -- after the point of anticipation of litigation,

13   what the evidence before the Court shows under the *In Re: Grand*

14   *Jury Subpoena* case is that you can't separate out the decisions

15   that the board was making about repairing the building from the

16   inherent fact that there's litigation being anticipated and a

17   suit actually underway.

18             So the discussions are not, hey, let's go ahead and

19   fix this.  What do you guys think?  The discussions are, the

20   insurance company hasn't paid us.  They won't pay us.  We're

21   going to have to sue them.  We don't have enough money.  So how

22   are we going to prioritize the repairs that we have to make?

23             You can't separate out anticipation of litigation and

24   helping me as an attorney work through this case from the

25   decisions that the board had to make under extreme

1  circumstances with litigation pending.  So that's the reason

2  for the additional redactions.

3          **THE COURT:**  Okay.  Mr. Dennis?

4          **MR. DENNIS:**  I'm not -- the test under Rule 26 as to

5  whether or not something is attorney work product is whether it

6  was a document created to assist counsel in the preparation of

7  the case.  Your Honor just mentioned that you looked at the

8  board meeting minutes and there's nothing in them that falls

9  into that category, nothing at all.  And the same is true of

10  all the other board meeting minutes produced by Sandpiper.  The

11  discussions in those meeting minutes have nothing to do --

12          **THE COURT:**  But -- okay.  And generally the board

13  meeting minutes are not going to be prepared for litigation.

14  They're to inform whoever, other parties, people living in this

15  facility about things that are ongoing.  So I guess,

16  Mr. Chriss, what -- your argument is that what has been

17  redacted there was done in anticipation -- I mean, regarding

18  the litigation to aid the litigation or what?

19          **MR. CHRISS:**  Yes.  It was done in anticipation of

20  litigation, Judge, and it's of the nature that I described

21  before.  It's --

22          **THE COURT:**  And I really don't know, I guess,

23  without --

24          **MR. CHRISS:**  Right.  And we've offered to submit

25  those in camera before.

1           **THE COURT:**  I know and maybe that's what --

2           **MR. CHRISS:**  Well, and you've already got them.

3           **MR. DENNIS:**  Well, we have examples of them, your

4    Honor.  We -- your Honor has read them.  The March 8th meeting

5    minutes, there's nothing in those, nothing at all.  Another set

6    was Exhibit -- the April 27 board meeting minutes.

7           **THE COURT:**  What -- I'm looking at -- what number is

8    that?

9           **MR. DENNIS:**  This is the April 27 minutes, the less

10   redacted version.

11          **THE COURT:**  Right.  But where are you, at Document

12   like 48-9 --

13          **MR. DENNIS:**  49-2, your Honor.

14          **THE COURT:**  Okay, I've got it right here.

15          **MR. DENNIS:**  Yes, 49-2.

16          **THE COURT:**  Yes.

17          **MR. DENNIS:**  Now -- let me know when you're ready,

18   your Honor.

19          **THE COURT:**  Go ahead.

20          **MR. DENNIS:**  Okay.  In the more redacted version

21   which was supplied to us later, the entirety of Agenda Item 6

22   was redacted.  Agenda -- the first paragraph of Agenda Item 4

23   was redacted were redacted.  So we look at the first paragraph

24   of 49-2 under Agenda Item 4 which has nothing to do -- actually

25   it has nothing to do with preparing this case for litigation.

51

1     They're talking about their renewal which is the ordinary

2     course of business of the building.

3          Then we can look at Agenda Item 8 which was

4     completely -- just a minute, your Honor -- Agenda Item 6 --

5     excuse me.  That was --

6          **THE COURT:**  Yeah, I'm not -- I'm kind of not seeing

7     how that is to aid litigation or --

8          **MR. DENNIS:**  It's not is the answer.

9          **THE COURT:**  Well, I know.  I'm asking Mr. Chriss.

10         **MR. DENNIS:**  I'm sorry.

11         **MR. CHRISS:**  Your Honor, the reason that my client

12    had to go get a new insurance policy is because of the way that

13    Lexington treated them on this claim and that's part of that --

14         **THE COURT:**  That may be but how does that aid you in

15    this litigation?

16         **MR. CHRISS:**  It relates to the litigation --

17         **THE COURT:**  Well, it may relate to it but that's not

18    the standard I don't think.

19         **MR. CHRISS:**  Well -- and all I can do is cite the

20    Court to the *In Re: Grand Jury Subpoena* case where --

21         **THE COURT:**  Yes.

22         **MR. CHRISS:**  -- the Court says, "The documents are

23         entitled to work product production because taking

24         into account the facts surrounding their creation,

25         their litigation purpose so permeated any non-

1             litigation purpose that the two purposes cannot be

2             discretely separated from the factual nexus as a

3             whole."

4        And what -- all I'm trying to say to the Court is,

5   this is not -- my client is not sitting there doing ordinary

6   business.

7        **THE COURT:**  Well, that may be true but that doesn't

8   mean then it's protected either.  I mean, they may be -- you

9   know, it's a whole different situation after the hurricane.

10  They were doing different things but I'm not seeing how the

11  information is -- in here is protected by the parameters of the

12  work product protection, I guess.

13       **MR. CHRISS:**  And I'm not going to argue with the

14  Court.

15       **THE COURT:**  Okay.

16       **MR. CHRISS:**  I'm going to respect the Court's ruling.

17       **THE COURT:**  Well, thank you.  Let's move on.  Okay.

18  So that was -- there was also emails.

19       **MR. DENNIS:**  Yes, your Honor, and -- well, before we

20  move off the meeting minutes, I guess the question is where do

21  we go from here?  We gave the Court certain examples of meeting

22  minutes that do not appear to us to be work product protected

23  under the Plaintiff's position.  There are, of course, further

24  meeting minutes.  They produced meeting minutes to us through

25  November which are the same thing.  We just didn't dump them

53

1  all on the Court.

2          THE COURT:  Well, it's the same ruling.  So if --

3  Mr. Chriss, if you think there is something particular in there

4  that I need to review in camera -- but if it's just more of

5  what we've been looking at, I'm probably going to, you know,

6  turn -- you just turn it over.

7          MR. CHRISS:  I will just have to go through those

8  meeting minutes after November of 2018, Judge, and do the best

9  I can and if I need to submit -- it's not voluminous.  If I

10  need to submit something to the Court, I will do so.

11          THE COURT:  Okay.  By?

12          MR. DENNIS:  Can you --

13          MR. CHRISS:  Thirty days.

14          THE COURT:  Okay.  So we're moving on to the email

15  string or what was it?

16          MR. DENNIS:  Yes, your Honor.  That's the example.

17          THE COURT:  Let me find it.

18          MR. DENNIS:  Once again, it's only an example of the

19  same issue.  It's at 49-4.

20          THE COURT:  Okay.

21          MR. DENNIS:  This is a document that doesn't even

22  relate to the Sandpiper.

23          THE COURT:  Wait.  I'm sorry.  Go ahead.

24          MR. DENNIS:  This is a document that relates to the

25  Seagull Condominium which is a condominium down the street from

1    Sandpiper.  And one of Sandpiper's contractors became aware of

2    this document which talks about the curb issues at the Seagull

3    and that contractor then flipped it over to Sandpiper's

4    management.

5         Now, it can't possibly be work product protected with

6    regard to the Sandpiper because it doesn't even relate to the

7    Sandpiper.  It wasn't done at the request of Sandpiper

8    management or Sandpiper counsel.  So -- but nevertheless, it

9    was delineated as work product protected.

10        **THE COURT:**  Okay.  Mr. Chriss, do you want to address

11   that?  I guess this was a report prepared for a different

12   building, right, with the -- yes.  Okay.

13        **MR. CHRISS:**  I'm not sure I know what document that

14   is being referred to here.

15        **THE COURT:**  Do you have with you what -- they filed a

16   supplemental or an exhibit.  What did you have -- sealed

17   exhibits.

18        **MR. CHRISS:**  I did not bring the supplemental

19   exhibits, Judge.

20        **THE COURT:**  Okay.

21        **MR. CHRISS:**  They were quite voluminous.

22        **THE COURT:**  Yes.  So that's where he's -- he's

23   talking about -- there was an email.  It has a report.  I

24   believe the report was attached to it and the report regarded

25   -- was regarding a different building and the email was between

1    -- I have it here.  Where is it -- Allbritton and -- I don't

2    know how --

3              **MR. CHRISS:**  If you tell me who it was, I can tell

4    you what the --

5              **THE COURT:**  Yeah.

6              **MR. DENNIS:**  Your Honor, so --

7              **THE COURT:**  It was to Charles Crawford --

8              **MR. DENNIS:**  I'll hand this to Mr. Chriss if we

9    could --

10             **THE COURT:**  Yeah, go ahead.  It's a report regarding,

11   I guess -- was it Seagull Condominium and it was attached to an

12   email.

13             **MR. DENNIS:**  Yes, your Honor.

14             **THE COURT:**  And I guess the Defense is saying, look,

15   this report doesn't even regard your property.  So how can that

16   be protected by the Work Product Doctrine?

17             **MR. CHRISS:**  Because Ms. Allbritton is the manager at

18   Sandpiper and so presumably the reason why this was being

19   provided to CCMS by Ms. Allbritton is somehow for use with

20   respect to Sandpiper.  And Hansen is one of Sandpiper's

21   engineering consultants and so that's the reason why this

22   appears to me to be communications between Ms. Allbritton and

23   other members of CCMS who were management personnel of

24   Sandpiper with respect to Sandpiper.  Ms. Allbritton doesn't

25   work at Seagull.  She only works at Sandpiper.

1      **THE COURT:**  So how does that aid litigation or what

2  is that for or how?  What's the connection?

3      **MR. CHRISS:**  Well, since the Court has already

4  overruled my argument under Texas privilege, then with respect

5  to the report as it relates to Seagull, I don't particularly

6  care about the report because it relates to Seagull.  So I

7  don't have a problem with the report if he apparently aren't

8  asking.

9      **THE COURT:**  Okay.  So we're good there?  Was there

10  another part of the emails or --

11      **MR. DENNIS:**  No, your Honor.  It was all one --

12      **THE COURT:**  Okay.

13      **MR. DENNIS:**  -- it was all one document and as we

14  indicated again in our motion papers, there are approximately

15  1,000 emails on their privilege log and your Honor touched on

16  this earlier.  So perhaps we've already resolved this issue is

17  that the privilege log just says, materials --

18      **MR. CHRISS:**  I know.  He just -- he's going to need

19  time to do that.  Right?

20      **MR. DENNIS:**  So then we've resolved that issue and

21  that's how we'll deal that.

22      **THE COURT:**  Okay.  Can we move on or is there

23  something else?

24      **MR. CHRISS:**  I'm happy to move on --

25      **THE COURT:**  Okay.

1          **MR. CHRISS:**  -- and do my best to supplement my

2    privilege log during the period --

3          **THE COURT:**  There was the motion to compel regarding

4    the reserves.  So do you want to first --

5          **MR. CHRISS:**  Yes, I have my motion to compel, your

6    Honor, yes.

7          **THE COURT:**  So -- and there was a response.  So if

8    you want to proceed on that, we can move to that.

9          **MR. CHRISS:**  Yes, your Honor.  We've cited to the

10   Court several cases that -- particularly in an extra-

11   contractual bad faith context where the allegation is -- and we

12   have specifically made this allegation in our Fourth Amended

13   Complaint where the allegation is that the insurance company

14   knowingly failed to settle the case when its liability was

15   reasonably -- or settled the claimant's liability was

16   reasonably clear.

17          There are several cases that hold that Plaintiff is

18   entitled to discover reserve information in that connection and

19   those -- we've cited to cases from the Federal District Courts

20   in Texas as well as Federal District Courts elsewhere.  There's

21   no other way that I know of -- other than to browbeat a

22   confession out of somebody, there's no other way that I know of

23   to get evidence of the state of mind of the insurance company

24   with respect to what it knows its liability is than to get

25   their reserve information.

1          Reserve -- the Court well knows what reserves are.

2     If you have a billion-dollar liability and a 10-percent chance

3     of getting stuck with that liability, your reserve is a hundred

4     thousand dollars.  If you've got a 10 million-dollar liability

5     and you're 90-percent sure that you're going to lose, that's a

6     9 million-dollar reserve.

7          Now, if I've got a case where the insurance company's

8     got a 9 million-dollar or a 10 million-dollar reserve and

9     they've only paid $3 million, that's a case where they've

10     knowingly committed bad faith.  They're withholding money that

11     they know belongs to my client.  And the reserve information

12     maintained by the Defendant themselves is at the very least

13     relevant to that inquiry.

14          **THE COURT:**  Okay.  Mr. Dennis?

15          **MR. DENNIS:**  Yes, your Honor.  As we cited to the

16     Court, numerous cases involving bad faith claims of exactly

17     this type in which Courts rejected discovery of reserves as not

18     being relevant and the reason for that is this.  Reserves are

19     not an admission of what is owed.  A reserve is what you keep

20     on your books as an insurance company so that if you lose all

21     of your arguments and all of your issues, you actually have the

22     cash to be able to pay a judgment.  That's what a reserve is.

23          And that was cited in the *Heights* (phonetic) case, a

24     bad faith case from the Western District of Washington.

25     *Mirachi* (phonetic), Third Circuit, another bad faith case,

1   allegations just like this one, reserves not relevant, not

2   discoverable because a reserve is not an admission.  It's not

3   an admission that we owe you this much.  It's not an admission

4   that, yeah, we calculated -- we did the calculations that

5   Mr. Chriss just stated.

6            A reserve is what is -- because you need to have the

7   money available to pay if you lose.  The same thing in the *U.S.*

8   *Fire* case, Eastern District of Michigan 2012.  *In Re: Couch*,

9   Central District of California, same thing, bad faith claim,

10  reserves not discoverable.

11           Moreover, in this case, there are particular reasons

12  why reserves are not relevant.  Mr. Chriss just said, oh, well,

13  they reserved up what they owed.  With regard to the

14  remediation costs, licensed consultant MKA met with Sandpiper's

15  contractor, the contractor that they selected, and they

16  hammered out the 4.2 million-dollar amount to be paid for the

17  remediation of the interior of the building.  We hammered that

18  out with their contractor which they knew about at the time.

19           Another instance is that our consultants MKA met with

20  the Sandpiper's engineers with regard to the windows and the

21  doors and this is the declaration of Mr. Hooper at 72-1 -- PCF

22  72-1.  As a result of that meeting, as referred to in the March

23  8th board meeting minutes that we just looked at, Sandpiper's

24  engineer said, yeah, we agree with MKA as to which windows were

25  damaged.

60

1          Now, whatever you might want to say about the general

2   case of reserves are this and reserves are that just because

3   there's a bad faith claim is not a valid argument and it's

4   particularly not valid in this case because many of these

5   issues were actually resolved with Sandpiper's own contractors

6   with Sandpiper's own knowledge.

7          Why do you need to know about the reserve for an

8   agreed-to amount of the contract?  I don't understand that.

9          **THE COURT:**  Okay.  Final comments on that from the

10  Plaintiff.  It's the Plaintiff's motion.

11         **MR. CHRISS:**  Yeah.  The reason I need to know that,

12  your Honor, is because I have alleged and I believe on

13  information and belief that when they went and hammered out

14  those things with our contractor, they knew they owed more

15  money.  And, in fact, one of the cases that counsel himself has

16  cited, the *Aetna Casualty and Surety Company* case out of the

17  D.C. District court says, "A reserve essentially reflects an

18  assessment of the value of the claim taking into consideration

19  the likelihood of an adverse judgment."

20         **THE COURT:**  The Court's going to grant --

21         **MR. CHRISS:**  That's what a reserve is.

22         **THE COURT:**  Yeah.  The Court's going to grant the

23  motion to compel.

24         Okay.  So we're going to move on from that motion and

25  I believe, Mr. Dennis, you had asked the Court if we could also

61

1   consider the number of depositions?

2            MR. DENNIS:  Yes, your Honor.

3            THE COURT:  And that's, I guess, not agreed to,

4   correct?

5            MR. CHRISS:  Well, Judge, I think it -- what I would

6   suggest is this and this is my suggestion about this.  I think

7   it's -- I don't think counsel can take 12 depositions between

8   now and the time the Court's going to rule on compelling

9   appraisal in this case and I don't think counsel can take 12

10  depositions before we mediate this case.  And so I think it's

11  premature to decide how many depositions each side should take

12  in this case because I think what he's talking about is taking

13  12 depositions -- he's already taken, I think, what, five?

14           MR. DENNIS:  We've taken four.

15           THE COURT:  So you want 12 instead of 10?

16           MR. DENNIS:  Yes, your Honor.

17           THE COURT:  You want two more?

18           MR. DENNIS:  That's all.

19           MR. CHRISS:  Well, but he just wants two more plus

20  experts, as I understand it.  So he wants -- he's basically

21  wanting to create a situation where he gets 20 depositions or

22  25, depending on how many experts I designate.

23           MR. DENNIS:  Well, we're entitled to depose his

24  experts.  If Mr. Chriss wants to designate 12 experts, which I

25  doubt -- but if he does, then we can depose more experts.

1        **THE COURT:**  I don't really see -- I don't know how

2   long your depositions are but I'm not seeing a big difference

3   between 12 and 10.  So I don't know when you-all are going to

4   do it.  I think Mr. Chriss is probably right, like you probably

5   don't want to do them before the mediation.  You probably can't

6   do them before the mediation but the Court will allow that.

7        There's one more thing I just want to clarify.  I

8   know Mr. Chriss -- out of an abundance of caution, you had

9   responded to the Plaintiff -- Defendant's answer to the Fourth

10  Amended Complaint.

11       **MR. CHRISS:**  I --

12       **THE COURT:**  I didn't take that as a motion because

13  these will not pop up on the motions list.  So --

14       **MR. CHRISS:**  Okay.

15       **THE COURT:**  -- we see them there and I've had to

16  address them before because we don't know.  But -- so just as

17  long as Mr. Dennis knows that the affirmative defenses, the

18  complaint fails to state a claim upon which relief can be

19  granted.  I mean, you actually have to file a motion to dismiss

20  with a lot more detail.

21       **MR. DENNIS:**  Understood.

22       **THE COURT:**  Yes.  Okay.

23       **MR. CHRISS:**  Well, then I will stop doing that, your

24  Honor.

25       **THE COURT:**  No, no.  I mean, it's -- you know, it's

63

1    been a problem.

2         **MR. CHRISS:**  I'm just paranoid.

3         **THE COURT:**  It has been a problem in the past.  So I

4    just wanted to clarify that.  I did not take that as a motion

5    to dismiss.  So it'll have to be filed and beefed up a lot more

6    for the Court to consider that.

7         So what else is pending from the Plaintiffs?

8         **MR. CHRISS:**  Nothing, your Honor.  Oh, one other

9    thing.  We were -- Counsel has mentioned that he had proposed a

10   couple of deposition dates on -- with respect to depositions

11   that I had asked to take before I demanded appraisal and I just

12   -- I don't want to take those depositions if the Court is going

13   to rule that that waives my right to appraisal.  So I just want

14   to raise that because I'm happy --

15        **THE COURT:**  Okay.

16        **MR. CHRISS:**  -- to wait and take those depositions.

17   And that's probably what I'll do.

18        **THE COURT:**  Well, what's the plan?  If you-all are

19   going to try to, I think, within ten days to get back to Court

20   on who can mediate within what timeframe, are you-all really

21   going to push forward with more discovery in terms of

22   depositions or what are your thoughts?

23        **MR. DENNIS:**  Well, your Honor, my thoughts are

24   probably not because we need to get some documents from the

25   Plaintiffs based on the rulings today and also some --

64

1      **THE COURT:**  Okay.  So no depositions.  Go to

2  mediation first.

3      **MR. DENNIS:**  So the only need -- there's -- we have

4  Friar scheduled for November the 6th.

5      **MR. CHRISS:**  I mean, I'm prepared to take -- I don't

6  have a problem attending that deposition.

7      **THE COURT:**  Okay.  So Friar is fine.  Anybody else?

8      **MR. CHRISS:**  But I would stop after that for now.

9      **MR. DENNIS:**  I can agree.

10     **THE COURT:**  Okay.  So just Friar for now.

11     What else?  Anything from the Defense?

12     **MR. DENNIS:**  Nothing, your Honor.  Nothing today.

13     **THE COURT:**  Okay.  Then you-all will let the Court

14  know if I need to appoint a mediator?

15     **MR. CHRISS:**  Yes, ma'am.

16     **THE COURT:**  Thank you.

17     **MR. CHRISS:**  Thank you.

18     **THE COURT:**  You can be excused.

19     **MR. DENNIS:**  Thank you, your Honor.

20     **(This proceeding ends at 4:33 p.m.)**

21

22

23

24

25

## <u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    <u>November 3, 2019</u>

            Signed                                      Dated


                *TONI HUDSON, TRANSCRIBER*